No. 88.—JEREMIAH TAYLOR AND OTHERS, plaintiffs in error, *vs.* JOHNSON, Governor, for the use of A. W. & W. P. CARMICHAEL, defendants.

[1.] Under the Acts of 1799, 1803 and 1845, is it the duty of the Judge of the Superior Courts to examine into the *solvency* as well as the *legality* of the Sheriff's bonds? *Quere.*

[2.] If a bond be executed by H H & Co. as securities for T, and the bond is rejected by the officer appointed to take it, and afterwards, and without the knowledge of the previous securities, the name of W be added to the bond, and the officer then accept it, is it void as to H H & Co.? *Quere.*

[3.] The liability of a surety cannot be extended beyond the actual terms of his engagement, and will be extinguished by any act or omission which alters the terms of the contract, unless it be with his consent.

[4.] It matters not whether the alteration in the contract be for the benefit of the surety or not, he has a right to stand upon the very terms of his agreement.

[5.] The only question in all such cases is, has the identity of the contract been destroyed? And would the plea of *non est factum* be over-ruled on demurer, on the ground that the bond remained the same?

[6.] Several plaintiffs in *fi. fa.* having distinct interests, may unite in a money motion against the Sheriff.

[7.] A rule absolute against the Sheriff, is *conclusive* against him, and *prima facie* evidence against his securities.

[8.] The rule, that the whole sum *must* be given, is never applied to an action of debt upon the Sheriff's bond, and that it is only in debt for an escape on execution, under the English Statutes of *Edward* and *Richard*, that the measure of damages is the amount of the debt, without abatement on account of the poverty of the defendant or of any other circumstance.

[9.] The object of our law in requiring the Sheriff to give bond, and prescribing its conditions, was to provide, in addition to other remedies, more ample security to all persons interested in its faithful performance.

[10.] It was not intended to increase the Sheriff's obligations or to render a more summary redress for his defalcations than existed by action on the case at Common Law; and therefore, not to conclude him from any defence which he had in that action.

[11.] The action of debt on the Sheriff's bond, is neither the remedy granted by the Statutes of *Edward* and *Richard* nor the Common Law action on the case. It is an action of debt on a statutory bond, with a collateral condition annexed, and a penalty prescribed for its violation.

[12.] At Common Law the whole penalty was recoverable. To remedy this hardship and to render a resort to Equity unnecessary, 8 *and* 9 *William III. ch.* 2 was passed ; and that Statute has been adopted in Georgia.

[13.] Under provisions of this Statute the defendant is liable to no greater damages than the plaintiff has sustained, to be ascertained by the verdict, after a full investigation of all the facts.

Debt, in Habersham Superior Court. Tried before Judge JACKSON, October Term, 1854.

This was an action, brought by the Governor for the use of A. W. & W. P. Carmichael against Jeremiah Taylor late Sheriff, and Thos. J. Hughes, Peter B. Haralson, James Colley and

Archer Whitehead, his securities, for a breach of his official bond. The declaration contained two counts—one founded on a rule absolute obtained against the Sheriff at a previous term of the Court, commanding him to pay over money to the plaintiffs, and which he had not obeyed; and the other setting forth a breach of his bond in not selling certain property of John B. Fields and Peter B. Haralson, levied on by him, in obedience to a writ of *fi. fa.* against them in favor of plaintiffs; and that he had failed to make the money on said *fi. fa.* or to return the same in the time prescribed by law.

Defendants pleaded, that since the granting the rule absolute, the property levied on had been sold and the proceeds distributed between this and other *fi. fas.;* that the defendants in *fi. fa.* had no other property and were insolvent; and that plaintiffs had not been damnified.

The plaintiffs offered in evidence the Sheriff's bond, in the usual form, and signed by all the parties, dated 2d February, 1852, attested as follows :

" Tested and approved by
          THOMAS B. WHEELER, J. I. C.
          JAMES GRIGGS, J. I. C.
          MOSES AYERS, J. I. C."
"Signed by Archer Whitehead, in my presence, 17th April, 1852.          PHILIP MARTIN, C. S. C."
On the bond was this entry :
          " Examined and approved, upon Archer Whitehead signing as additional security, in presence of the Clerk of the Superior Court, and ordered to be entered on the minutes, April 17th, 1852.          JAMES JACKSON, J. S. C. W. C."

The defendants objected to the admission of the bond in evidence, on the ground, that by the Act of Dec. 26, 1845, the Court was not authorized to strengthen the bond, by requiring another name to be signed to it; and the bond so altered could not bind either the former securities or the one then signing.

The Court over-ruled the objection and admitted the bond in evidence; and this decision is assigned as error.

The plaintiffs introduced the original declaration and judgment, and then a *fi. fa.* in their favor against Peter B. Haralson and John D. Field, for the sum of $136 $\frac{84}{100}$.

On the *fi. fa.* were the following entries:

"25th February, 1853. Levied this *fi. fa.* on lot of land No. 39, in the 2d district of Habersham County, containing 245 acres, more or less, the place whereon defendant, Haralson, now lives, and whereon is situated the store-house occupied by said Haralson, in the village of Mount Yonah; and lot of land No. 15, in the 2d district of said county; 250 acres, more or less, known as the Boyd place, as Field's property, and 125 acres, more or less, of lot No. not known, in the 2d district of said county, improved, known as the Joe Hunt place; and part of lot of land No. 62, in the 2d district of said county; 215 acres, more or less, the place whereon Elisha Cannon now lives. Pointed out by P. B. Haralson.

J. TAYLOR, Sh'ff."

"4th October, 1853. All the above land sold according to law to Robert McMillan for Two Hundred and Ten Dollars; and after paying all the cost, including levy, sale and advertising fees of this and eleven other *fi. fas.* hereinafter named, leaves a balance of Thirty-two Dollars to be credited *pro rata* on this *fi. fa.* and two in favor of Force, Conley & Co.; one in favor of Wm. E. Jackson & Co.; one A. W. & W. P. Carmichael; one G. W. Ferry & Co.; one B. W. Force, J. P. Force & Benjamin Conley, survivors of L. M. & B. W. Force & Co.; two, Dunham & Bleakly; one, Snowden & Shear; one A. P. Dearing, Agent, &c.; one Carmichael & Bean; one Baker & Wilcox. All of said *fi. fas.* issued from the Superior Court of said county, against Peter B. Haralson & John D. Field; *pro rata* share of this *fi. fa.* being one dollar and twenty-three cents.

J. TAYLOR, Sh'ff.

Received of J. Taylor, Sheriff, my cost, October 13, 1853.
                        PHILIP MARTIN, C. S. C."

The plaintiff then offered in evidence a *rule nisi*, of which the following is a copy:

L. M. & B. W. Force & Co. *vs.* Peter B. Haralson and John D. Field.

Wm. E. Jackson & Co. *vs.* the same defendants.

Force, Conley & Co. *vs.* the same defendants.

The same *vs.* the same.

Dunham & Bloakly *vs.* the same defendants.

The same *vs.* the same.

A. W. & W. P. Carmichael *vs.* the same defendants.

Carmichael & Bean *vs.* the same defendants

A. P. Dearing, Agent, *vs.* the same defendants.

G. W. Ferry & Co. *vs.* the same defendants.

John R. Stanford *vs.* Gabriel Sisk.

Pitner & England, use of Gould, Bulkly & Co. *vs.* John C. Addison and John H. Wyly, security.

Ramey & Story *vs.* George Mills.

Joseph Scales *vs.* James McCracken.

Horsey, Ives & Co. *vs.* Thomas M. Alston.

All the foregoing being *fi. fas.* from Habersham Superior Court, it is ordered by the Court that Jeremiah Taylor, Sheriff of said county, return said *fi. fas.* into Court with his actings and doings thereon, and show cause by this day at twelve o'clock, or so soon thereafter as Counsel can be heard, why he does not pay over to the several plaintiffs hereinbefore specified, or their Attorney, the several sums of money due to each of them, respectively, on said *fi. fas.*
                    JOHN R. STANFORD, Pl'ffs' Att'y.

A true transcript from the minutes of Habersham Superior Court, April Term, 1853.
                        PHILIP MARTIN, C. S. C."

To the admission of this paper in evidence defendants object-

ed, on the ground that several *fi. fas.* especially when in favor of different plaintiffs and against different defendants, could not properly be included in one and the same rule.

The Court over-ruled this objection and admitted the testimony; whereupon, defendants, by their Counsel, excepted.

Plaintiff then offered a rule absolute, taken at the same term of the Court, which, after reciting the rule *nisi*, including the statement of the same *fi. fas.* and stating that the Sheriff had shown no cause, went on to order, that the Sheriff do pay to the several plaintiffs in *fi. fa.* certain named sums of money, among which was the sum of one hundred and forty dollars and twenty-five cents to the present plaintiffs.

To this paper defendants made the same objection and on the same grounds taken to the rule *nisi*; and being over-ruled by the Court they excepted.

The plaintiffs here closed their case.

Defendants introduced sundry *fi. fas.* against Peter B. Haralson and John D. Field, in favor of various plaintiffs, on which there was due and unpaid about three thousand dollars, and of the same date with the *fi. fa.* of the present plaintiffs; and a *fi. fa.* against Haralson for about four hundred dollars, of older date.

It was shown, also, that on eight of these *fi. fas.* amounting to about three thousand dollars, suits were now pending against them in Court, on the Sheriff's bond.

Defendants then introduced, as a witness, William A. Hunt, who testified that the property levied on under the *fi. fa.* of plaintiffs, in February, 1853, was all that he knew the defendants in *fi. fa.* to have at that time, except a cow or two that were supposed to be running in the mountains, and a few hogs in the woods, not, in all, amounting to more property than is allowed to defendants under the Exempting Law; that in the fall of 1852 the defendants in *fi. fa.* had a store at Mt. Yonah, containing a stock of goods worth, then, perhaps, several hundred dollars; that this stock was very much reduced by the latter part of the winter, being then a mere remnant; that

such property as that levied on was rising in value from February to October, A. D. 1853.

They also introduced Edward Ferguson, who testified that he was acquainted with defendants in *fi. fa.* in 1853, and knew them to have no property but what was levied on, and that property of the sort levied on was generally rising, from February to October in that year.

Counsel for defendants requested the Court to charge, that if all the property of defendants in *fi. fa.* subject to levy and sale, had been actually levied on by the Sheriff and ultimately sold, these defendants, or at least those of them who were securities, could only be liable for the actual loss arising to plaintiffs in consequence of the delay of the sale; that the rule absolute against the Sheriff was no evidence against the securities; that if the Jury believed, from the evidence, that the defendants in *fi. fa.* were insolvent at the time the *fi. fas.* were in the hands of the Sheriff, or that all their property in the county, subject to levy and sale, had been sold under the *fi. fa.* of plaintiffs or other *fi. fas.* and applied to the payment of judgments against them according to their legal priority, before the institution of this suit, the Jury would be authorized either to find for the defendants or to reduce the damages to the amount of injury actually sustained by the plaintiffs in *fi. fa.* in consequence of the neglect or misconduct of the Sheriff; or, if the Jury should believe, from the evidence, that any property of the defendants in *fi. fa.* had been unsold, they might increase the verdict by such an amount as the *fi. fa.* of plaintiffs would be entitled to, of the proceeds of such property, if brought to sale.

This charge the Court refused to give, but charged the Jury as follows:

" That the rule absolute was *conclusive* evidence against the Sheriff, and *prima facie* evidence against the securities; that hence, the securities could protect themselves in this suit upon their bond, by any defence which would have availed the Sheriff in reply to the rule absolute. The question then was

narrowed to this: would the facts now proved by the securities, that the property was levied on by the Sheriff prior to the granting of the rule *nisi*, but unsold until two terms of the Court had elapsed, and the rule *nisi* and absolute had both been granted, and that the Sheriff had in his hands the other *fi. fas.* in evidence before the Jury, have been a good and sufficient reply to the rule absolute by the Sheriff? If so, they would protect the securities now; if not, they afforded no protection to the securities now. In the judgment of the Court, they could not have protected the Sheriff in reply to the rule; and therefore, were no protection to the securities in this suit upon their bond, notwithstanding the subsequent sale of the property levied on, and the distribution of the proceeds thereof to the other *fi. fas.;* and hence, it was the duty of the Jury to find for the plaintiffs, with interest and cost; and that the true measure of damages was the amount of the debt, with interest, at twenty per cent. from the date of the rule—and they must so find under this law of the case."

To which charge and refusal to charge defendants excepted.

The Jury returned a verdict for plaintiffs for One Hundred and Forty Dollars and Twenty-five Cents, principal, with interest thereon, at twenty per cent. from the 14th day of May, 1853, with costs of suit.

And the Counsel for defendants excepted, on the following grounds:

First. That the Court erred in over-ruling the objection made by defendants to the admission of the paper purporting to be a Sheriff's bond in evidence.

Second. That the Court erred in allowing the rule *nisi* tendered by plaintiffs to go in evidence.

Third. That the Court erred in allowing the rule absolute to go in evidence.

Fourth. That the Court erred in refusing to charge as requested by defendants.

Fifth. That the Court erred in charging that the rule abso-

lute was conclusive evidence against the Sheriff, and *prima facie* evidence against the securities.

Sixth. That the Court erred in charging that the Sheriff's securities could make no defence to this suit that the Sheriff could not have made to the rule *nisi.*

Seventh. That the Court erred in charging that the debt of plaintiffs was the measure of damages, and that the Jury must find that amount for plaintiffs.

Eighth. That the Court erred in charging the Jury that the facts proved in this case constituted no defence for the Sheriff or his securities, either in bar or in mitigation of damages.

ACKERMAN; COBB & HULL, for plaintiffs in error.

STANFORD, for defendants.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Every point in this case is encompassed, more or less, with doubt and difficulty—perhaps none more so than the first.

Jeremiah Taylor having been elected Sheriff of Habersham County the first of January, 1852, on the fifth day of February next ensuing, gave bond for the faithful performance of the duties of his office, with Thos. J. Hughes, P. B. Haralson, James Colly and R. Nash as his securities. The bond was attested and approved by three Justices of the Inferior Court.

On the 17th day of April thereafter, being the first sitting of the Superior Court for that county after the election and qualification of Taylor, Judge JACKSON examined the bond, as it was made his duty to do, under the law, and passed the following order: "Examined and approved by Archer Whitehead's signing as additional security, in presence of the Clerk of the Superior Court." And this was done, as appears by the official attestation of that officer.

The action against the Sheriff and his securities, for the official misconduct of the Sheriff was brought upon this bond;

and when the bond was offered in evidence, it was objected upon the grounds—1st. That by the Act of December 26, 1845, the Judge of the Superior Court was not authorized to strengthen the Sheriff's bond, by requiring another name to be signed to it—and 2dly. That the bond, so altered, could not bind either the old or the super-added security.

The first question necessarily involves a construction of the Act of 1845—and in order to do this intelligibly, it becomes necessary to glance briefly at our previous legislation upon the same subject.

The Act of 1799 (*Cobb's Digest* 57, 45) declares, "That the Sheriffs of the several counties shall attend the Superior and Inferior Courts in the respective counties when sitting, and by themselves or deputies, execute throughout the counties all writs, warrants, precepts and processes directed to them, under the authority of any Judge or Justice of the said Superior or Inferior Courts, or the Clerk of either of the Courts; and the said Sheriffs or their deputies shall have power to command all necessary assistance in the execution of their duty; and to appoint, as there shall be occasion, one or more deputies; and before any Sheriff shall enter upon the duty of his appointment, and being commissioned by the Governor, he shall be bound, for the faithful performance of his duty, by himself and his deputies, before any one of the said Judges, to the Governor of the State, for the time being, and to his successors in office, jointly and severally, with two good and sufficient securities, inhabitants and free-holders of the county, *to be approved of by the Justices of the Inferior Court or any three* of them, in the sum of $20,000; and the said bond shall remain in the office of the Clerk of the Superior Court of such county, and may be sued for by order of said Court, for the satisfaction of the public or persons aggrieved by the misconduct of the Sheriff or his deputy," &c.

In 1803, doubts having arisen as to who was the proper person authorized and intended by the foregoing act, *to take* the bonds and obligations of Sheriffs, a declaratory Statute was passed, (a very common sort of legislation in this State) to the effect: "That any Judge of the Superior or a majority of the

Justices of the Inferior Courts of the respective counties throughout this State, is and are, and by intendment of law, ought to have been taken, held, deemed and considered as competent in law *to take* the bonds or the obligations of Sheriffs and to qualify them as by law directed." (*Cobb's Digest*, 199.)

By a careful perusal of the Act of 1799 and 1803, it will be seen that the doubts which arose under the former of those Statutes and the remedy provided by the latter for their removal, related exclusively to the question as to who should take Sheriffs' bonds; and the law directed that either the Judges of the Superior or the Justices of the Inferior Courts, or a majority of them, might perform this service. And by scrutinizing the Act of 1799 closely, does it not seem plain that no matter by whom the bond was *taken, the security was to be approved by the Justices of the Inferior Court or a majority of them?* To secure its *legal execution*, the duty of *taking it* might well have been confided to the Judges of the Superior Courts. At the same time, it must be admitted, that the Justices of the Inferior Courts of the respective counties are better qualified, by their local knowledge, to judge of the sufficiency of the security.

With this passing remark upon the previous Statutes, we come to the Act of 1845. It purports to be "An Act to alter and amend the several Acts then in force in relation to the *taking* of Sheriff's bonds," and declares, that "From and after its passage, it shall be the duty of the Judges of the Superior Courts of this State, at the first sitting of the Superior Court in any county, after a Sheriff shall have been elected and qualified for such Courts, to examine the official bond of such Sheriff; and if the bond has not been taken in conformity to the law, it shall be the duty of the Sheriff to give *another* (?) bond in conformity to the law—which bond the Judge is hereby authorized and impowered *to take;* and when so taken, shall be entered on the minutes of the Superior Court." (*Cobb's Digest*, 217).

Did the Legislature, by this Act, intend to confer upon the

Judges of the Superior Courts the power of examining into the *solvency* as well as the *legality* of Sheriff's bonds?

We cannot resist the conviction, from the phraseology of this Statute as well as its predecessors of 1799 and 1803, that it was designed to delegate to the Judges of the Superior Courts the duty of supervising the formal execution of Sheriff's bonds, leaving it to the Inferior Courts, as before, to take care of their solvency. The Judges, says the Act, are to examine the bonds to ascertain—what? Whether the security is sufficient? No, but whether they have been taken *"in conformity to the law."* What was the mischief? Not that the public had suffered on account of the insolvency of Sheriff's securities, but that they had escaped, by reason of some technical defect in these instruments. This was the evil intended to be remedied.

We know, however, that a different construction has been put upon this Act in some sections of the State; and contemporaneous construction, when it is general and uniform, should have some influence even in the interpretation of a recent Statute. Perhaps the General Assembly had better settle this difficulty definitely; and thus, save further litigation upon the point.

[2.] Conceding, however, that his Honor, Judge JACKSON, was authorized to act in the premises, what is the effect of the change made in this instrument? The Act requires that *another* bond be taken in conformity to the law. Here an additional security was added to the old bond, without the privity or consent of the former securities.

Respectable authority may be found on both sides of this question. The case in *Levinz, p.* 35, establishes, that after the delivery of a bond a new obligor may be added in this way, without avoiding the instrument as to any previous party. Chief Baron *Gilbert* in treating on this topic observes, "but if any material part of the contract be altered, after sealing and delivery—as if A, with a blank left after his name, be bound to B, and after, C is added as a joint obligor, this does not avoid the bond; for he was bound to pay the whole money, without such

addition." (1 *Lofts' Gilbert*, 111.) And the case of *Yonah vs. Clay*, which the author quotes as reported in *Ventris*, 185, undoubtedly sustains the doctrine; for there, the Court overruled the plea of *non est factum*, on the ground that the bond remained the same as to the previous obligor. And the note at the end of *Pigot's* case, (11 *Coke*,) also recognizes this principle.

But in *O'Neale vs. Long*, (4 *Cranch*, 59,) the Supreme Court of the United States held, that if a bond is executed by O, as security for S, to obtain an appeal from the judgment of a Justice of the Peace, and the bond is rejected by the Justice; and afterwards, and without the knowledge of O, the name of W be interlined as an obligor, who executes the bond, and the Justice then accepts it, it is void as to O.

Mr. *P. B. Key* contended, in the first place, that the deed was void by the alteration in a matter essential; thereby making it the deed of four when it was only the deed of three persons; and that it was immaterial whether the alteration was for the benefit of the obligor or not, the only question in all such cases being, whether the deed be substantially varied. He insisted, secondly, upon the authority of *Whelpdale's* case, (5 *Coke*, 19 b,) that after the rejection of the bond by the Justice, it could not be again set up without a new delivery; that the Justice was substituted, by the law, for the obligee, and that his rejection is equally fatal as if the bond had been tendered to and refused by the obligee himself. (*Shep. Touchstone*, 70.)

Mr. *Mason*, on the contrary, argued that the alteration did not vary the deed, as it was obviously for the benefit of the defendant; that it was not the less the deed of the defendant because it became the deed of another; that it was in the nature of a judicial proceeding and not a mere matter of contract between man and man. It is a security required by law in a civil action.

Chief J. *Marshall*, who delivered the opinion of the Court, stated, "that the Judges did not agree upon the same ground, some being of the opinion that the bond was void by reason of

the alteration; and others, that it was vacated by the rejection of the Magistrate, and could not be set up again without a new delivery—but that all agreed that the bond was void."

Two cases more perfectly parallel could not well be imagined.

[3.] [4.] The rule of law is not disputed, that the liability of a surety cannot be extended beyond the actual terms of his engagement; and that his liability will be extinguished by any act or omission which alters the terms of the contract, unless it be with his consent. And for myself, I am satisfied that the uniform doctrine of the books, supported by numerous decisions, is, that it matters not that the alteration be for the benefit of the surety, because he has a right to stand upon the very terms of his agreement. And it is no answer to a surety to say that the alteration is not material. He has a right to determine for himself, whether he will or will not consent to the alteration—whether *he thinks* it material or immaterial. No power of man can alter his engagement, and his liability be retained. He has a right to stand upon the very terms of his contract; and without *his* consent, any variation of it is fatal. The law will not allow others to speculate as to whether or not the alteration be to his prejudice. Adhere to this rule and the course of Courts is safe and simple. Depart from it and there is no limit—where will you stop? Who can tell what considerations influenced the first securities to enter into this undertaking with one another for Taylor? Pecuniary responsibility is not the only nor always the main motive which moves parties to unite in such an undertaking. Personal as well as pecuniary considerations have much to do with it. There may be rich men that would be willing to be bound with Taylor; and yet, Hughes and the other sureties might utterly object to such an association. Has not each co-obligor the right to select his fellow-bondsmen? Where the measure of damages is unsettled, the popularity of parties in a community will have its influence, justly or not, in the amounts for which verdicts are rendered. But I forbear to enlarge. Suretyships stand upon the exact agreement they have entered into, and

they would not stand without it.   If it be a needful undertaking which is doubted by many and positively forbidden by Scripture, it is at least always one of peril; and it most usually overtakes and overwhelms those whom we could most wish to see saved—the generous and the humane.   That is a bad policy which would increase its dangers.

[5.] The only question then is, has the *identity* of the bond been destroyed?   Would the plea of *non est factum* be overruled on demurrer, on the ground that the bond remained the same?   We forbear to decide this question.

[6.] The plaintiff tendered in evidence a rule *nisi*, including sixteen cases, calling upon Taylor, the Sheriff, to return the *fi. fas.* into Court with his actings and doings thereon; and to show cause why he did not pay over to the several plaintiffs therein specified, the amount of money due to each of them respectively, upon the executions.

To the admission of this paper in evidence defendants objected, on the ground that these various cases in favor of different plaintiffs and against different defendants, could not be included in the same rule.   The Court over-ruled the objection and allowed the testimony to go to the Jury; and thereupon, defendants, by their Counsel, excepted.

The only authority read and relied upon in support of this exception is, the case of *Patterson et al. vs. The Officers of the Circuit Court of Mobile*, (11 *Ala. R.* 740.)   The first head note is, that several plaintiffs having distinct interests, cannot unite in a motion against the Sheriff.

Without stopping to inquire whether or not the opinion of the Court justified this marginal proposition, we have only to say, that a contrary practice, founded in convenience, and attended with no practical evils, has obtained in all the Courts of all the Circuits in this State, time immemorially.   And that we see no sufficient reason for departing from it at this late day.   Any number of parties unite in a creditor's bill.   And a money motion has always been analogized to a proceeding in Equity.

The same objection was taken to the rule absolute as that

alleged against the rule *nisi*, and was over-ruled by the Court, and the decision excepted to.

We deem it unnecessary to repeat what we have already said upon this point.

[7.] The next question made by the record is, how far was the rule absolute taken against the Sheriff, evidence in the suit upon the bond against his securities? Counsel for the defendants insisted on its entire rejection: whereas, the other side maintained that it was conclusive as to the liability of the securities. The Court following the lead of most of the American cases and of this Court, took the middle ground, and charged that the rule absolute was *conclusive* against the Sheriff, and *prima facie* evidence against the securities.

After a careful re-consideration of the rule adopted by this Court upon this subject, we are disposed to adhere to it, although it is somewhat difficult to perceive upon what principle it rests. One thought is suggested by this record—there are two breaches assigned in the suit upon the bond—one, the failure or refusal of the Sheriff to obey the rule absolute ordering him to pay over the money; and the other, the neglect of the Sheriff to sell the property levied on according to law. Is not his disobedience to the rule absolute such "*official misconduct*" as constitutes a breach of the bond? And is not the judgment against him conclusive against the securities and every body else, of that fact? As to the *quantum* of damages assessable under this assignment, that is quite a different thing.

Mr. Justice *Johnson*, late of the Supreme Court Bench of the United States, said in one of his opinions, that Lord *Coke* "seldom let an opportunity escape him that furnished an apology for exemplifying his indefatigable research, and to make each case he reported authority for a score of positive decisions and the introduction to a mass of law upon questions totally distinct. And that his *Reports*, like the *Text of Littleton*, are only to be considered as the occasion or excuse for displaying his acquirements in the law learning of his day, and expressing his opinions upon judicial topics."

If *Reports*, which have gone through some twenty *English*

editions, and *Commentaries,* which are styled the "Golden Book," "The Bulwark of the Law," &c. are thus criticised, I shall content myself with citing merely some of the leading cases upon this head. (See *Munford et al. vs. Overseers of the Poor of Nottaway,* 2 *Randolph's R.* 313. 1 *Wash. (Va.) R.* 31. 3 *Atkin.* 248. *Peak on Ev.* vol. I. *p.* 26. 4 *Monf.* 243. 10 *Viner's Ab.* 464. 1 *Greenlf. Ev.* §187. 12 *Wheat.* 515. 5 *Binney,* 184. 6 *Ala. R.* 826. 2 *Leigh.* 393. 4 *Ohio,* 487. 4 *Monf.* 317. *Note* 3 to 4th *vol. of Cowan & Hill's Notes to Phil. on Ev. Part II.* 3d *edition.*)

[8.] The last and main assignment of error is as to the rule prescribed by the Court as to the measure of damages in this case.

Judge JACKSON, under the decision of this Court in *Crawford, Gov. &c. vs. Wood, Wofford et al.* (7 *Ga. R.* 445,) charged the Jury, that the measure of damages was the amount of the plaintiff's debt, with interest and cost, and 20 per cent. damages, from the date of the rule absolute.

The facts in the case are these: On the 26th of October, 1852, a *fi. fa.* at the instance of A. W. & W. P. Carmichael, the defendants in error, against Peter B. Haralson of Habersham and John D. Field of Lumpkin County, for the sum of $186.$\frac{35}{100}$, including interest and cost, was issued and delivered to Jeremiah Taylor the Sheriff of Habersham County; that on the 25th of February, 1853, Taylor levied upon lands of Haralson in Habersham County; that at the adjourned term of the Superior Court, held on the 13th day of May, 1853, the property being unsold and no return of *nulla bona* made as to either of the defendants, a rule absolute was obtained against the Sheriff ordering him to pay over, *instanter,* the money due upon the plaintiff's *fi. fa.;* that on the 4th of October, 1853, Taylor returned on the *fi. fa.* that he had sold the land for $210, and that he had distributed the money to the plaintiff's execution and eleven others against the defendants, still making no return of no further property to be levied. And thereupon, on the 24th of February, 1854, the plaintiffs brought

their action of debt upon Taylor's official bond, against him and his securities.

The defendants proved that the proceeds of the property levied on had been distributed to the various *fi. fas.* according to their respective liens; that all of Haralson's property had been sold except a cow or two supposed to be running at large in the mountains and a few hogs in the woods, not amounting to more property than is allowed under the Exempting Law, in favor of poor debtors; that in the fall of 1852 defendant had a store at Mount Yonah, containing a stock of goods worth, perhaps, several hundred dollars; that the stock was reduced to a mere remnant by the latter part of the winter; that the property levied on was rising in value from February, 1853, when it was levied on, to October of that year, when it was sold. These facts were substantially testified to by all the witnesses.

We are compelled to admit that it is competent for the Sheriff, in a case like this, to prove, in mitigation of damages, any facts showing that the plaintiffs have suffered nothing or but little by his default or breach of duty. (7 *M. & W.* 463, 473. 4 *Id.* 145. 10 *Mass. R.* 470. 1 *N. H.* 82. 2 *Mass.* 526. 2 *Bay,* 395. 2 *Bing.* 317. 1 *Johns. R.* 215. 7 *Id.* 189. 11 *Mass. R.* 89. *Id.* 188. 2 *Greenlf.* 46. 45 *En. Com. Law R.* 577. 28 *Id.* 383. 1 *M. & W.* 713. 2 *Cr. & M.* 413. 10 *A. & E.* 719. 2 *Eng. Law & Eq.* 260. 73 *En. C. L. R.* 371. 24 *Maine,* 183. 5 *N. H.* 433. 2 *Mass. R.* 374. 10 *Id.* 479. 6 *Pick. R.* 468. 9 *Metcalf,* 564. 9 *Conn. R.* 380. 16 *Id.* 555. 1 *Hill's N. Y. R.* 8. 4 *Sandf. N. Y. R.* 67. 8 *Watts,* 153. 5 *Watts & Serg.* 455. 2 *Gill.* 62. 9 *Leigh.* 397. 1 *Hawks,* 425. 1 *Iredell,* 318. *Harper's Law R.* 73. 1 *Bailey,* 646. 4 *Littell,* 152. 4 *J. J. Marshall,* 202. 3 *McLean's C. C. R.* 97. 4 *McCord,* 84. 16 *Ohio,* 539. 6 *Ga. R.* 244. *Sedg. on the Measure of Damages,* 506.)

Indeed, I am satisfied that the rule, that the whole sum *must* be given, is never applied to an action of debt upon the Sheriff's bond; and that it is only in debt for an escape on execution, under the English Statutes, that the measure of

damages is the amount of the judgment, without abatement on account of the poverty of the debtor or any other circumstance. And yet, so firmly persuaded I am of the necessity of holding all officers to a rigid accountability, from the Chief Magistrate of the Union down to a tide-waiter or a railway tract-walker; and seeing, as I think I do, in many of the adjudicated cases, the cause as well as the proof of the degeneracy and disregard of the law in these latter days, I would, were it in my power, uphold and maintain the doctrine in *7th Georgia Reports* in all its stringency—not because it emanated from this Court, but because it is calculated to subserve and promote the best interests of the country. But convinced, as I am, that to do so would be to assume legislative functions, I cannot hesitate as to my duty.

[9.] [10.] The object of our law in requiring the Sheriff to give a bond and prescribing its conditions, was to provide, in addition to other remedies, more ample security to all persons interested in its faithful performance. It was not intended to increase the Sheriff's obligations or to render a more summary redress for his defalcations than existed by action on the case at Common Law; and consequently, not to conclude him from any defence which he had in that action. In a suit before a bond was required, actual damages only could be recovered, unless the action under the Statutes of *Westminster* 13, *Ed. I. ch.* 11, and 1 *R. II. ch.* 12 was adopted. Why should the amount to be recovered be different after the bond? A suit on the Sheriff's bond is no more a pursuit of the remedy presented by the Statutes than was the action on the case. And this is the clear, legal and conclusive view of this subject which has controlled my judgment.

[11.] This, we repeat, is an action of debt, not under the Statutes of *Westminster* and *Richard,* but on a bond—a Statutory bond—with a collateral condition by the Sheriff and his securities, for the faithful discharge of his duties, and with a penalty annexed for a violation. At Common Law the whole penalty was recovered, notwithstanding it far exceeded the injury sustained.

[12.] To remedy this hardship and to render a resort to Equity for relief unnecessary, the Statute of 8 and 9 *William III. ch.* 11 was enacted. And that Statute has been adopted in Georgia. (*Schley's Digest,* 288.)

[13.] Under its provisions the defendant is liable to no greater damages than the plaintiff has sustained, to be ascertained by the verdict of a Jury, except in a certain class of cases, and this is not one of them. On the contrary, this case falls under the general rule, where the measure of damages is not fixed and certain, and where the party can only recover the damages which the Jury shall believe he has actually sustained under all the circumstances, and after a full investigation of all the facts.