THE CHARLOTTE, COLUMBIA AND AUGUSTA RAILROAD COMPANY, plaintiff in error, *vs.* JAMES L. GOW *et al.,* defendants in error.

1. The agent of a corporation, being under bond to account and pay over daily, cannot be trusted with more money at his surety's risk after dishonesty of the agent is discovered by the corporation But he may be so trusted, so long as the circumstances, fairly interpreted, point, not to moral turpitude, but to a want of diligence or punctuality rather than to a want of integrity.

2. For the agent (unless continued in further trust after known dishonesty) to bring about his surety's discharge by deviation from the terms of his bond, such deviations must be rightful and not wrongful. And to be rightful, they must rest either upon some new contract, or upon instructions from the corporation.

3. The charge of the court considered, and pronounced erroneous.

Principal and security. Principal and agent. Corporations. Before Judge Gibson. Richmond Superior Court. October Term, 1876.

The pleadings are sufficiently stated in the opinion. The plaintiff introduced in evidence the bond sued on, dated November 21, 1871. Also the report of the auditor appointed in the case, who found that R. Habersham Wylly, as principal, was indebted to the plaintiff on an account running from November, 1871, to October, 1874, balance of $6,346.06.

Wylly testified before the auditor, in substance, as follows: Became agent of plaintiff in November, 1871. At first, made remittances about four times a month. There was subsequently a change to weekly remittances, and then to daily. Think latter course was adopted in July, 1873. As long as I pursued the plan of periodical remittances I deposited to my own credit in the Augusta National Bank. Freight prepaid, was money collected by me for freights going northward. Freight received, was southward bound freight for Augusta, and points beyond. My reports for freight received were made from freight-bills which were consolidated and brought together in one month, not from cash actually received. When I came into office, merchants of good business standing in Augusta, were permitted to take away their freight from the depot without paying charges, that is to take it on credit. Had visits from the president, superintendent, general freight agent or treasurer generally once a month. The officers of the plaintiff had opportunities of seeing the plan I was following, and frequently had conversations with me on the subject. There

was some correspondence about giving credit for freight, the result of which was that it was determined that in order to compete with other roads the credit system was necessary. This system caused my remittances to appear smaller than the amount of freight apparently received. The balance against me consists of freight uncollected, freight on hand, and a part may have been cash to my credit in bank. I either remitted the money in bank, or paid it out on good vouchers. Did not appropriate it to my use. Any money that I collected but did not deposit, was remitted to plaintiff in cash or by vouchers.

W. A. Graham is indebted to me $1,197.19 on ticket sales; he was in office when I became agent, and remained as ticket agent until the close of December, 1872. He remained in the employment of the plaintiff as loading and unloading clerk after ceasing to be ticket agent. There was objection to him as ticket agent, but I continued him for some time so as to give him a chance to make up the difference. Baird attended to the duties of the office while I reported Graham as ticket agent. This was after Graham had been objected to.

By reference to consolidated account current, I find that in November, 1871, I made three remittances; in all the other months I made more than three. Accounts current were made from reports of freight received; made the accounts current as embodying what the agent was responsible for; forwarded account current each month. Started it with an adjusted balance showing what was due at close of previous month. Do not admit all accounts current revised and signed by me as correct; signed them officially as matter of form; they differ in some respects from my original reports. It was not my own fault that I was unable to carry on the business. Admit that I was frequently drinking while agent, but don't think a great part of the trouble is due to that. Could attend to duties when not under the influence of liquor. The cash collected was turned over to me by different collectors, which I had from time to time.

Should have had a regular book-keeper; that was what was neglected.   Cannot assert positively that Graham was acting as ticket agent when I took charge.

The remainder of this witness' testimony is taken up with showing the assets turned over by him after his discharge, and that he had not sufficient force allowed him by the plaintiff to·do the work required.

F. H. Gordon testified, in substance, as follows : Was employed in the treasurer's office of plaintiff during the period embraced in the agency of Wylly, up to June, 1873 ; after that date, as auditor of the road.   Remittances were sent to the treasurer.   Wylly had no fixed day on which to report; his practice was, as was also that of his predecessor, to send forward his vouchers about once a week ; he had no money to remit, as it was generally consumed in settling freight exchanges with the Georgia Railroad, and other connecting roads at Augusta ; that was his duty, and then to remit any excess held by him.   When he had money, he was required to remit daily, but he scarcely ever had any ; frequently money had to be sent him from Columbia to finish paying freight exchanges.   Nine-tenths of his remittances were in vouchers received from these settlements.   He did not remit cash collected by him to Columbia (the headquarters of the road) daily ; the practice before he came into office and after, was not thus to remit.   Did not notify Gow that he was not so remitting.   He did make daily remittances during the latter part of his time.   He was not discharged for failure to make daily remittances, but for inattention to business of agency.   Knew that he delivered freight without prepayment, but don't think the company had any such practice.   Upon my appointment as auditor, told Wylly that he and his bondsmen were responsible for deliveries, and that he ought not to pursue such course.   Such deliveries were without authority, though I do not know that any officer of the company forbade them.   There was a balance against Wylly carried forward from month to month ; this is an incident to all agencies.   It was impossible for the officers of

plaintiff to know whether this balance represented freight undelivered and remaining in the warehouse, or freight delivered and uncollected for. The president and superintendent do not look after such matters as relate to the details of agencies except upon report of irregularities. I know of no such report having been made of Wylly until September, 1873, when he was discharged. Johnston was president of the road until October, 1872; Palmer succeeded Johnston. The president only had the authority to instruct agents. Wylly never received any instructions in violation of the terms of his bond, with reference to the delivery of freights or remittances. The plaintiff did not connive at Wylly's delaying remittances or deliveries of freight without prepayment. He was not in the employ of the company at the time the rules of 1870 were issued. As soon as I discovered irregularities in Wylly's agency, I at once discharged him, and on the same day notified Gow. Considered the clerical force allowed Wylly ample.

Extracts from printed rules to govern station agents were introduced.

January 1, 1870.—"Remittances must be made to the treasurer weekly—the last remittance to close month's business to be made in sufficient time to reach this office not later than the second day of the month succeeding the one for which credit is asked."

"Agents will be allowed until the 5th of each month to have their reports of previous month's business in the general agent's office. No deviation from these rules will be permitted."

June 2, 1873.—"Collection of charges. Receipts and delivery of freight. Your attention is directed to general rules which require that charges on freight (unless prepaid) must be collected on delivery. This rule has been sometimes disregarded, but must not be hereafter. Agents have no discretion in the premises, and will be held personally responsible for any loss occurring from neglect of this rule."

E. P. Alexander testified, in substance, as follows: Was

superintendent of plaintiff from May, 1871, to September, 1872, inclusive.  I never authorized any change, alteration or modification of the terms or obligations of Wylly's bond, or any administration of his duties in any manner inconsistent with its requirements.  It may be that daily remittances were sometimes found to be inconvenient or impracticable, and that they were not insisted upon oftener than once a week, but if so, it was but as a concession to the agent's convenience from day to day.  E. R. Dorsey was general freight and ticket agent.

Letter from Dorsey to Wylly, dated Columbia, February 29, 1872 :

" I wish to call your attention to your freight exchange account for November and December.  I enclose herewith a statement of same, with debits as rendered by you, and credits as given by the treasurer, which show a balance carried from November to December, and finally a balance of $90.57, belonging to earnings of 1871, carried into those of 1872.  You are aware of the fact that our business is settled monthly, and that a statement of earnings is made up each month for the board of directors, and you can readily perceive how impossible it is to make a true report while balances are carried from one month into another.  I wish to show you the importance of closing every month your freight exchange account, so as your credits in treasurer's office will balance with charges column of freight forwarded report.  This is easily done.  It is done at Charlotte and Columbia.  I have endeavored often to impress the importance of this system on Mr. Williams, the former agent at Augusta, who settled in the same manner that you do, but never succeeded.  I hope, however, in future, that I will have no more trouble with this important account at your agency."

James L. Gow testified, in substance, as follows : Had no notice of non-payment of freight before delivery, nor of Wylly's failure to make daily remittances.  Made no inquiries as to how he was conducting the affairs of the agency.

Read the bond before signing it, but did not remember its provisions. Signed it as the friend of Wylly, to enable him to obtain the agency. He had no property at the time of the execution of the bond, and is now insolvent. Have no security of any kind to secure me against loss.

Plaintiff, in rebuttal, introduced extract from rules to govern station agents, dated January 1, 1870, as follows:

" Agents are expressly prohibited from delivering freight to consignees until all charges thereon are paid."

William Johnston, president of plaintiff until November, 1872, and John B. Palmer, president since, testified that they did not ever authorize, or direct, any change, alteration, or other interference with the terms, conditions or requirements of Wylly's bond; that they never authorized, or directed, the administration of the duties of his agency, in any other or different manner than the requirements of his bond prescribed; and that no other officer of the company was authorized to make a change or departure from the terms or conditions of the bond.

D. H. Van Buren testified, in substance, as follows: Succeeded Wylly as agent of plaintiff at Augusta. Wylly was about the office for two months after his discharge, drawing the usual pay, pretending to make a balance-sheet. He was generally drunk and incapacitated for work. His books and accounts were in gross confusion. The two months allowed him to straighten up his account was more than sufficient time. He ought to have been able to have rendered a balance-sheet in a day. I can make a full exposition of my account in a few hours. The business now is more than double what it was during Wylly's term. With a less clerical force than he had, I find no difficulty in keeping the business well up.

W. A. Gibbs testified that the confusion in the affairs of the agency during Wylly's administration, was the result of his intemperance during the last three months of his term. That the president and superintendent visited the Augusta agency about once a month; that it was no secret to the

employees at Augusta that freight was delivered without pre-payment. Corroborates preceding witness as to sufficiency of clerical force.

P. N. Baird testified that clerical force prior to early part of 1873, was wholly inadequate; subsequent to that time, if properly employed, ample ; also, that under Wylly's administration there was no system, etc.

The jury found for the defendant Gow, but against the defendant Wylly, $5,000.00 principal, with interest from September 5th, 1873.

The plaintiff moved for a new trial because the verdict was contrary to the law and the evidence, and because of errors in certain charges of the court, all of which are set forth in the opinion. The motion was overruled, and the plaintiff excepted.

H. CLAY FOSTER, for plaintiff in error.

JNO. T. SHEWMAKE, for defendants.

BLECKLEY, Judge.

The action (commenced March 11th, 1874,) is by a corporation, the obligee in a bond, against the obligors, Wylly as principal, and Gow and another Wylly as sureties. The bond bears date November 21st, 1871, is in the penal sum of five thousand dollars, and the obligors are bound, jointly and severally, for the payment thereof; the obligation, however, to be void on condition that the obligor Wylly, (the principal,) shall well and faithfully execute, perform and discharge all the duties as agent of the corporation, and shall require all the freight charges and passenger fares to be paid in cash, and account to the corporation therefor daily, and transmit or pay over all money so received to the treasurer or proper officer of the corporation—said payments to be made daily—and deliver to all owners all goods, chattels or merchandize which may arrive, or be committed to his care or charge, as agent at the Augusta

depot, or at any depot where he may be placed in charge of business of the corporation, and collect freight charges according to the terms and rates prescribed by the corporation. The breaches assigned in the declaration are, that Wylly failed to well and faithfully execute, perform and discharge all the duties as agent of the corporation; that he did not require all the freight charges and passenger fares to be paid in cash; that he did not account to the corporation therefor daily, and transmit or pay over all money so received, to the treasurer or proper officer of the corporation, daily; that he failed to collect all freight charges in cash, and transmit or pay over to the treasurer or proper officer of the corporation all money received from freights and passenger fares, but retained and refuses to account for six thousand dollars so had and received. Gow alone defended. He pleaded " not indebted," and that the plaintiff failed and neglected to enforce so much of the condition as required of the principal daily accounts of cash received, and daily remittances and daily payments to the proper officer of the corporation, and payment in cash for freight charges, but on the contrary allowed, consented to, agreed and required accounts and remittances at longer intervals, and consented to, agreed, and connived at the delivery of freights upon credit, without the consent or knowledge of Gow, whereby his risk was increased and he exposed to greater liability. There was a further special plea, but it was not insisted on. The evidence, as condensed by the reporter, will appear in the report.

Most of the cases cited by counsel, as well as some others, we have examined. Special attention should be directed to Pittsburg, Fort Wayne and Chicago Railway Co. *vs.* Shaeffer, 59 Pa. St., 350; Atlas Bank *vs.* Brownell, 9 R. I., 168; McKecknie *vs.* Ward, 58 N. Y., 541; Phillips *vs.* Foxall, L. R., 7, Q. B., 666; and Sanderson *vs.* Aston, L. R., 8 Exch., 73. While, from these authorities and those they refer to, we have derived much assistance, we have not considered that they rule for us the precise case before us.

1. When the agent of a corporation, appointed for an indefinite time, is under bond to account and pay over daily, and he fails to perform for one day, or any number of days, whether he can be afterwards trusted with additional funds at the risk of the surety upon his bond, consistently with good faith and fair dealing, without first giving notice to the surety, depends upon the apparent cause of his failure. If the corporation, or its supervising officers, have reason to believe that it results from dishonest practices or intentions, such as a conversion of the money, or a purpose to convert it, no further funds can rightfully be committed to his custody. If, on the other hand, the circumstances do not point to moral turpitude, but to lax habits of business, mere negligence, procrastination, a want of diligence or punctuality rather than a want of honesty, the corporation may continue to trust him, treating his successive failures in promptness as breaches of contract only, and relying upon the bond for protection should ultimate loss occur. When a thief is detected, confidence ought to be withdrawn, at least until those who are likely to be injured by his larcenies have been warned. To persist in supplying him with money after he has made up his mind to steal, and you know it, is contrary to sound morality, unless you mean to bear the loss yourself. Considerations, not of contract only, but of crime, are involved. A question of honesty is raised, and honesty and equity are one. You cannot knowingly expose your own to the grasp of known dishonesty, at another man's risk, he being absent and unwarned. To do so and make him bear the consequences, is to do, not equity, but iniquity. On the other hand, indolence, carelessness, inattention to business, want of promptness, a disposition to put off and procrastinate, are failings that, for the most part, stay outside of the penal Code, and may consist with moral integrity. Of such infirmities and their consequences, a surety may be supposed to have considered, once for all, when he entered into his contract. They are, so to speak, insurable, though hazardous, and the underwriter may be left to take care of himself.

When they furnish the apparent reason why money and accounts are not forthcoming at the time or times appointed, the case is not desperate, and business may proceed. Other explanations of delay may be consistent with honesty. In naming some, it is not meant to suggest that the enumeration is complete.

2. For the agent's deviation in performance, from the terms of the bond, as set out in the condition, to be ground for the discharging his surety (except on the score of continuing the trust after known dishonesty), the deviation must be rightful and not wrongful. Wrongful deviation would be a breach of the condition, and, of course, would tend to hold the surety and not to free him. For a deviation to be rightful, it must rest, either on convention or on instructions. Any change of terms, by a new agreement between the corporation and the agent, being made without the surety's consent, the surety would no longer be bound except to answer for a prior breach, if any had occurred. So, if without any new agreement, the agent be instructed by the corporation to disregard any of the terms of the condition favorable to the surety, and he does so, the surety is thereby discharged. Even a *nudum pactum*, acted upon and executed, would be effective as instructions from the corporation to the agent, and would work the same result. This is because the agent, though under bond, is to be guided by the will of the corporation, his master. Being subject to its orders, his obedience to its commands could not be a breach of his obligation. But care is to be taken, whether in the case of agreement or instructions, that the will of the corporation has been duly expressed or signified. Novation, to be recognized as such, must take place through an officer or agent having power to contract in the premises on the corporate behalf. So, instructions must proceed from the officer or agent whose business it is to make known the corporate will in like cases generally, or in the particular instance by special authority. It will be unsafe to treat a new contract as existing, or certain instructions as duly given, without scrutinizing the

powers of those officers or agents concerned in the transaction. To group them under the designation of "superior officers," and there stop, will not be sufficient, unless the evidence shall warrant the inference of ratification by competent authority; as to which, see 18 *Ga.*, 431, 432; 20 *Ga.*, 276. Implied contract, or implied instructions, if clearly established, would have the same effect as express contract or express instructions. But the implication should' be absolutely necessary, under the evidence, and rise to such force as to be equivalent to open and direct expression. In dealing with so solemn an instrument as a specialty, its regular legal operation should not be varied by matters resting on inference, without great strength of conviction as to the precise matters alleged.

We have now sketched the principles which we deem applicable to the case before us, in the light of the pleadings and the evidence. The surety is discharged if the corporation discovered dishonesty in the agent and afterwards entrusted him with more funds, without first giving some notice or warning to the surety; or if the agent deviated in performance from the conditions of the bond, rightfully; which he could not do except by contract or under instructions, either express, or so plainly and certainly implied as to be equally definite and free from doubt as if openly and directly expressed. Of course, any discharge, by whatever means effected, would not operate retrospectively, so as to exempt from suit for breaches previously occurring. Notice of such breaches would not be necessary to perfect the right of action, or to preserve it throughout the period allowed for suit by the statute of limitations. See what is said upon the subject of notice in *Wright vs. Shorter*, 56 *Ga.*, 77, 78.

3. It remains to consider the several points in the court's charge to the jury, complained of in the motion for new trial. The exact language of the charge is quoted from the record:

(*a*) "That if the jury find from the evidence that plain-

tiff departed from the terms of the contract set out in the bond, by authorizing, or consenting to, or conniving at, the delivery of freights on a credit by Wylly, without the consent or knowledge of Gow, the surety, then the surety, Gow, is not liable in this action for losses resulting from such credit deliveries."

We think this paragraph of the charge erroneous, because the contract set out in the bond does not stipulate for anything inconsistent with a grant of authority, at the will of the corporation, to deliver freights on a credit. On the contrary, the agent undertook to collect all freight charges according to the terms and rates prescribed by the company. The terms were at the control of the corporation, and the agent's duty was to obey instructions. Compliance with instructions would be compliance with the bond touching this part of his duty. After proving such compliance in making delivery and in efforts to collect after delivery, neither the agent nor his surety would be answerable for failure to collect. Losses which resulted from the terms, and not from neglect of the agent to carry them out, must be borne by the company. The chief objection to the paragraph is, that it misconstrues the contract, and puts the jury to looking for a departure where there could be none. So we think.

(*b*) "In determining these questions of change of contract—consent—connivance, and authority, and knowledge of violations and breaches of contract, you will look to acts as well as words of parties—also omissions and silence of parties, and ascertain therefrom, and all other evidence, the conduct and intent of parties in relation to the matters in dispute," adding thereto, "and if plaintiff knew of such violation, and did not object, then assent may be inferred."

This part of the charge, except the concluding proposition, seems obscure. Perhaps it was plain to the jury, for they had it in its due order and connection. The silence of a corporation is not in itself a matter from which much can be inferred against it. Knowledge, attended with fail-

ure to object, unless the jury should believe the circum-
stances called for objection, would be no basis for an infer-
ence. What facts will enable the jury to infer other facts,
is generally matter for the jury to decide for themselves.
Besides, a contract secured by an agent's bond ought to be
kept until the corporation contracts to change it, or until
the agent is instructed not to execute it. Why should the
agent violate it, and take license, from the mere silence of
the corporation, to repeat the violation over and over?
The agent and the surety undertake that their bond shall be
performed. The corporation is not bound to see to the per-
formance as to matters which come clearly within the sure-
ty's undertaking.

(c) "Any change of the terms of the bond, without the
consent of the surety, within the knowledge of plaintiff, or
the superior officers of Wylly, by which losses accrued, can-
not be charged to the surety. Hence if the default of
Wylly was by reason of non-payment of freights before de-
livery, or non-transmission of collections daily, with the
knowledge, permission or consent of plaintiff, he is not lia-
ble therefor, and your verdict should be for the defend-
ant, Gow." Mere knowledge of the corporation would not
be sufficient to work discharge, nor would that of the agent's
superior officers, as a class. What officers are referred to,
and what are their powers and duties, would be material
even if their knowledge would suffice. We have already
said that a departure by the agent from the terms of the
bond, unless known to be dishonest in act or purpose, would
not discharge the surety, unless done by contract, or in pur-
suance of instructions. Any other departure would be
simple breach of the bond, and instead of being a reason
for letting the surety off, would be the best of reasons for
holding him liable and making him pay.

(d) "No delay or non-action by plaintiff in compelling
payments, or allowing freights delivered without payment,
unless for a consideration or benefit to plaintiff, will dis-
charge the surety, unless loss accrued thereby to securities

held, or it amounted to such conduct on the part of plaintiff as to so change the contract or bond as to increase the risk of the surety." If the jury understood this paragraph, it probably did no harm. We think, however, it is too vague, and that it should be omitted when the case is tried again. · The vagueness is principally in the words "such conduct," and in the possible implication that delay or non-action might work a change in the contract.

(*e*) "If the maker, Wylly, permitted goods to be delivered without payment of freights, and loss accrued therefrom, and the plaintiff knew of such delivery without prepayment, the surety, Gow, cannot be charged with such loss." This is undoubtedly erroneous. In the first place, it assumes that delivery without prepayment of charges would infringe the condition of the bond, though sanctioned by the company. This, we have said, is not our construction of the language of the condition. But if it would infringe the condition, surely knowledge by the company, especially without reference to the time of acquiring it, would not be enough to saddle the company with the loss. The truth is, that whether the agent or the company should be the loser as to freight charges not collected, depends upon whether the agent complied with or violated his instructions.

(*f*) "One of the requirements of the bond being that Wylly should make daily settlements, if the plaintiff permitted, allowed or consented to, weekly or monthly payments, and losses thereby accrued, the surety, Gow, cannot be charged therewith." We think this was error. It would be quite right to permit all the payments, whether daily, weekly or monthly, that the agent would make. If the plaintiff, by contract or instructions, dispensed with daily payments, and authorized weekly or monthly payments in lieu thereof, the risk of the surety was increased, and he was discharged from that time forth. We will add that general orders, such as appear in the record, are not necessarily inconsistent with the condition of the bond. They stand to this contract somewhat as general statutes do to a particular

44

statute. It would be altogether practicable, and might be altogether reasonable, to have special regulations for the Augusta agency depending upon specific contract—such a contract as the condition of the bond sets forth.

(*g*) " This is a bond for the faithful performance by Wylly of the duties of agent for plaintiffs, and in two of its most important stipulations, the manner of its performance specifically stated; any change of its mode and manner of performance by the agent, with the consent, knowledge or approbation of the plaintiffs, by which the risk of the surety was increased, or from which losses accrued, will discharge, and you should so find."

Omitting the word " knowledge," this paragraph may be deemed correct; but what will constitute consent or approbation should be squared with what has been said in reference to contract and instructions. Moreover, that discharge as to later breaches would not necessarily involve discharge as to earlier ones, should not be lost sight of.

Cited for the corporation: 59 Pa., 350 ; 1 Am. R., 31 ; 46 *Ga.*, 426 ; 33 *Ib.*, 173, 184 ; 57 *Ib.*, 433 ; 30 *Ib.*, 249 ; 44 *Ib.*, 12 ; 2 Metcalf, 176 ; 14 Barbour, 232 ; 46 Tenn., 263 ; 16 Maine, 72 ; 10 N. H., 162 ; 11 Ala., 523 ; 13 Ohio, 84 ; Code, §2154 ; 55 *Ga.*, 374 ; 33 *Ib.*, 173 ; 47 *Ib.*, 273 ; 17 Am. R., 281 ; 8 Am. L. Reg., (N. S.) 110 ; 11 Am. R., 232 ; 58 N. York, 546 ; 4 J. B. Moore, 153 ; 37 *Ga.*, 438 ; 55 *Ib.*, 664 ; 21 Am. R., 608 ; Angell & Ames on Corporations, §321 ; 7 Curtis (U. S ) R., 446, 454 ; 19 Am. R., 53 ; 2 Metcalf, 541 ; 18 Wallace, 662 ; Code, §2154 ; 55 *Ga.*, 374, 664 ; 57 *Ib.*, 433 ; 47 *Ib.*, 273 ; 48 *Ib.*, 489 ; 1 Am. R., 606.

Cited for the surety : 3 Parsons on Contracts, 356 ; DeColyar on Guarantees, 432, 434 ; 17 *Ga.*, 534 (3), (4) ; 52 *Ib.*, 555 ; Code of 1873, §§2153–4 ; DeColyar on Guarantees, 276, 394, 396 ; 10 *Ga.*, 235 ; 51 *Ib.*, 205 ; 11 Eng. Com. Law, ( 5 B. & C.) 458 ; DeColyar on Guarantees, 324, 376, 385 ; Hunt *vs.* Roberts, 45 N. Y. Rep., 691 ; Phillips *vs.* Foxall, L. R., 72, B. 666, July, 1872 ;

McKeukie *vs.* Ward, 17 Am. R., 281; Atlas Bank *vs.* Brownall, 11 Am. R., 231; Pidcock *vs.* Bishop, 3 B & C, 605 (10 Eng. C. L.); 51 *Ga.*, 205; 1 Greenleaf's Ev., §197; 1 Starkie's Ev., 49, 50, 55–6, 61, 62; 1 Greenleaf's Ev., §48; 55 *Ga.*, 566; 48 *Ib.*, 152; 53 *Ib.*, 607; 20 *Ib.*, 245 (8); 55 *Ib.*, 438; 17 *Ib.*, 99; Code, §2200; *Bryan vs. Walton*, 20 *Ga.*, 480 (11 request), (12); 53 *Ib.*, 144; 1 Gr. Evidence, 48; Story on Agency, §95; 41 *Ga.*, 186; *Statham vs. The State*, 41 *Ga.*, 507.

Judgment reversed.