Henry G. Smith, J.,
delivered the opinion of the Court.
On the 10th day of December, 1867, the Commissioner of Registration, of Gibson County, registered the name of Wm. Staten, as a qualified voter, and issued to him a certificate that he was entitled to the privilege ’ of the elective franchise, and authorized to exercise the same. On the 25th day of February, 1868, the Governor of the State issued his proclamation, reciting that “frauds and irregularities had intervened in the registration of voters in said county,” and declaring the registration of that county void, and setting it aside. On the 7th day of March, 1868, an election was held in said county for Sheriff of the county; and the said Staten, under color of the certificate issued to him, as aforesaid, and without any other certificate of registration or authority, cast his vote for Sheriff, at said election.
On the 26th day of March, 1868, the grand jurors of the county found a bill of indictment against said Staten, for illegal voting, which bill set forth» the facts above recited.
To the indictment, the defendant put in a demurrer, assigning for cause of demurrer, that the facts set forth in the indictment do not constitute an indictable offense.
*236 Upon this state of the pleadings, and upon the facts set forth, the question is, whether the Governor possessed the power to set aside and annul the registration, and thereby deprive the defendant of the elective franchise, and the right to vote in governmental elections, by virtue of his registration, and certificate of registration ?
The positions and argument assumed and urged for the defendant, are: first, that the Acts of the General Assembly which bestow upon the Governor the power to set aside and annul the registration of voters, are repugnant to the Constitution of the State, and therefore void; and second, that the general franchise Act of February 25th, 1867, chapter 26, is likewise repugnant to the Constitution, and therefore void.
It is proper to state with some detail, the article of the Constitution, and the several Acts of the General Assembly, which are concerned in the questions in issue.
For the purpose of organizing anew ..the government of the State, which had been destroyed by the rebellion, the people of the State, on the 22d day of February, A. D., 1865, ordained and established divers amendments of the Constitution of the State. The 9th section of the amendments, is as follows: “The qualification of voters, and the limitation of the elective franchise, may be determined by the General Assembly which shall first assemble under the amended Constitution.”
The General Assembly which first assembled under the amended Constitution, proceeded to enact, and did enact, on the 5th day of June, 1865, the Act, chapter 16, entitled “An Act to limit the Elective Franchise.” *237 It is not material to the decision of the cause now under consideration, to state the provisions of this Act with particularity of detail. It is enough to state, that the first section of the Act declares that the persons who “shall he entitled to the privileges» of the elective franchise,” are white citizens of twenty-one years of age and upwards, who “entertained unconditional Union sentiments” “from the outbreak of the rebellion to the time of the passage of the Act;” and also, white male citizens who arrived to the age of twenty-one years after March 4th, 1865, and never engaged in armed rebellion against the United States; and also, loyal white citizens of the United States and of the county wherein they ofier to vote, and who come from another State; and also, white citizens who served in the United States armies and were honorably discharged; and also, white citizens who were conscripted by force into the Confederate army, and were Union men and loyal to the United States; and also, white men who voted in this State at the Presidential election of November, 1864, or who voted at the State election on the 22d of February, 1865, or at the election on the 4th of March, 1865; or who have taken the oath of allegiance to the United States and are known to the judges of the election to have been true friends to the United States, and would have voted at those elections had they been holden within their reach.
The 2d section of the Act denied the privilege of the elective franchise, for fifteen year’s, to divers classes of persons who had committed offensive acts of kind designated, in aid or countenance of the rebellion; and *238 denied the exercise of the elective franchise, for five years, to divers other classes of persons implicated in divers designated ways, in the rebellion. It is unnecessary to describe these classes of disqualified persons, with further particularity.
The 6th section of the Act, enacts “that the Clerk of the County Court of each county, shall open and keep a registration of voters,” and ascertain by proof under oath, the persons entitled to vote under the provisions of the Act, and shall issue to such persons certificates of registration; and that no person shall be permitted to vote unless so registered.
The 9th section of the Act, declares that the power is reserved to alter, amend or change the provisions of the Act, at any time when the General Assembly which enacted it may be of opinion it is right and proper to do so.
Afterwards, at a subsequent session of the same General Assembly, and on the 3d day of May, 1866, An Act was enacted, to alter and amend the Act, of which the substance is above recited. This amendatory Act is chapter 33, of the session, and is entitled “An Act to alter and amend An Act, entitled ‘An Act to limit the Elective Franchise/ passed June 5th, 1865.” This new Act enacts that every white male inhabitant of the State, of the age of twenty-one years, a citizen of the United States, and resident of the county wherein he may offer his vote, “shall be entitled to the privilege of the elective franchise, subject to the following exceptions and disqualifications.” The exceptions and disqualifications are, briefly stated, persons who have borne *239 arms against tbe United States for tbe purpose of aiding tbe rebellion; or have “voluntarily given aid, comfort, countenance, counsel or encouragement to any rebellion; or have aided, countenanced or encouraged acts of hostility to tbe United States; and persons who have sought or voluntarily accepted any office, civil or military, or have attempted to exercise tbe functions of any office, civil or military, under the Confederate States or of any insurrectionary State, hostile to tbe United States, with intent or desire to aid said rebellion or. insurrec-tionary authority; and persons who voluntarily supported any pretended government or authority hostile to the United States, “by contributions in . money or property, by persuasion or influence, or in any other way whatever.” Some exceptions are made out of these several classes of disqualified persons. It is not necessary to designate them with further detail.
Other sections of the Act provide, that the Governor shall appoint a Commissioner of Eegistration for each and every county in the State, whose duty shall be, to ascertain by proof, and register the name of each and every qualified voter, and issue to each a certificate that he is entitled to the privilege of the elective franchise. The proof required, with few exceptions, is the evidence of two competent witnesses, known to the Commissioner to have been at all times unconditional Union men; that they, the witnesses, are personally acquainted with the person claiming to be registered, and “verily believe that he has not been guilty of any of the disqualifications” in the Act mentioned. This proof is to be by affidavit. The applicant is required to take and subscribe an affi *240 davit, that he has never voluntarily borne arms with intent to aid the rebellion; nor, with' such intent, at any time, given aid, comfort, counsel or encouragement to the rebellion; and that he has not ever sought or accepted or exercised the functions of any office, under the authority of the Confederate States or any insurrectionary State hostile to the United States, with the intent or desire to aid the rebellion; and that he never gave a voluntary support to the Confederate States or any insurrectionary State. The Commissioner is authorized to take and hear proof against, as well as for, the applicant, and shall be the judge of the weight of the conflicting testimony, so far as the same may affect the issuance of certificates. No person shall be entitled to vote at any election, unless registered, and shall have received a certificate of registration. Any applicant or witness - swearing falsely to any of the required facts, shall be guilty of peijury. Every violation of the Act is declared a misdemeanor, and punishable by indictment or presentment, and by fine, not less than ten nor over one hundred dollars, and by imprisonment at the discretion of the Court. Certificates issued under the original Act, are declared to be annulled. The original Act of June 5th, 1865, is declared to be repealed, and the new Act substituted in lieu of it.
Neither of these Acts of which the substantial provisions have been recited, conferred, nor did any other prior Act, in terms, confer, upon the Governor, or any other officer, the power to remove a Commissioner of Registration, or the power to abrogate the registration of a county, or to annul the certificate issued to a voter, or to take from a registered voter, the privilege *241 of the elective franchise. Subsequently, however, to the passage of these Acts, and at the same session at which was enacted the last mentioned Acts, the General Assembly enacted the Act of March 8, 1867, ch. 36. The' fourth section of this Act empowers the Governor to set aside the registration of any county, and make known the same by proclamation, “when it shall be made to appear to his satisfaction, that frauds and irregularities have intervened in the registration of the voters of such county.”
Again, and on the 25th day.of February, 1867, at a subsequent session of the same first General Assembly, An Act was enacted, ch. 26, to alter and amend the Act of May 3d, 1866, ch. 33. This Act of February 25th, 1867, is the same, in its provisions material to the present case, as the Act of May 3d, 1866. Its principal variance is, that it omits the word, white, as a term of qualification of voters, and authorizes persons of color to exercise the elective franchise, if possessing the prescribed qualifications in other respects, and not exceptionable by reason of the disqualifications, which are the same as those prescribed in the Act of May 3d, 1866. This Act of February 25th, 1867, is the final Act enacted by the first General Assembly of the State, prescribing the qualifications of voters, and the limitation of the elective • franchise, by virtue of the power conferred by the sep. 9, of the constitutional amendments of February 22d., 1865. This final Act is declared to alter and amend, and be in lieu of, the two preceding Acts of June 5th, 1865, and of May 3d, 1866.
It may be proper to add, that, the second General *242 Assembly, which convened after the ratification of the constitutional amendments, enacted An Act on the 26th day of February, 1868, ch. 52, which declares, that the Governor shall have power to remove from office, Commissioners of Registration, “for dereliction of duty, frauds or irregularities;” and to set aside the registration of any county, in whole or any part, of the registration, “when it shall be made to appear to the satisfaction of the Governor, that frauds and irregularities have intervened in the registration of voters of such county.” And the Act confirms all removals and appointments theretofore made by the Governor, of Commissioners of Registration, and all acts of the Governor “declaring registrations of the different counties in this State null and void.”
The third section of the Act enacts, “that airy persons violating the provisions of the preceding sections, by voting, or attempting to vote, by virtue of a certificate issued from a registration thus declared null and void, shall be guilty of a misdemeanor, and upon conviction, be fined not less,than fifty, nor exceeding one hundred dollars.”
The foregoing recitals show: The -.defendant, Staten, was registered, and received his certificate on the 10th day of December, 1867, under the Act of February 25th, 1867, the second in the series of Franchise Acts. On the 25th day of February, 1868, the Governor issued his proclamation, declaring the registration of voters in that county, void. On the 7th day of March, 1868, Staten voted at the election on that day. The Act empowering the Governor to set aside and avoid registrations, was enacted on the 8th day -of March, 1867, which was before *243 tlie proclamation, declaring tlie registration of the county void. Upon this condition of facts, the defendant was guilty of a punishable misdemeanor, which is charged in the indictment, if. the Act be valid which empowers the Governor to set aside and avoid registrations and certificates.
The elective franchise is a right which the law protects and enforces as jealously as it does property in chattels or lands. It matters not by what name it is designated — the right to vote, the elective franchise, or the privilege of the elective franchise — the person who, under the Constitution and laws of the State, is entitled to it, has a property in it, which the law maintains and vindicates, as vigorously as it does any right of any kind which men may have and enjoy.
The rules of law which guard against deprivation or injury, the rights of persons in corporeal properties, are alike and equally applicable to the elective franchise, and alike and equally guard persons invested with it, against deprivation of, or injury to it. Persons invested with it, cannot be deprived of it, otherwise 'than “by due process of law.”
To the same extent that persons cannot be deprived of their lands and’ chattels, or rights and franchises of any kind, otherwise than “by due process of law,” is it also true, that, “without due process of law,” they' cannot be deprived or divested of the muniments which evidence and establish their titles and rights, such as deeds, bills of sale, bonds, promissory notes and the like; and the certificate of registration, and right to vote, may be properly included in the category.
*244 All this is declared and ordained by the organic law of the land. The seventh section of the bill of rights declares, “that no freeman shall be taken or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land.” The phrase, “the law of the land” is another expression for the “due process of law;” and is of equivalent import, in respect to the question involved in the present litigation.
The “due process of law,” or the “law of the land,” by which a person may be deprived or divested of his properties, rights privileges or franchises, or of his muniments, or evidences of properties and rights, or by which such muniments or evidences may be annulled or cancelled, is not an act of the Legislature, or any act of executive power, or a proceeding in a court other than a proceeding wherein the party whose wright is involved, can have, or is authorized to have, a hearing and to make defense. A definition given by Mr. Daniel Webster of “due process of law,” has been much commended. The law of the land or due process of-law, he says: “Is the general law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property and immunities, under general rules which govern society:” 4 Wheaton, 519. Mr. Justice Edwards, (12 New York Reports, 209,) defines the rule thus: “Due process of law, undoubtedly means, in the due course *245 of legal proceedings, according to those rules and forms which have been established for the protection of private rights.” Mr. Justice Johnson, of the Supreme Court of the United States, says: (4 Wheaton, 235:) “As to these words from Magna -Charta, after volumes spoken and written, with a view to their exposition, the good sense of mankind has settled down to this, that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established. principles of private rights and distributive justice.” Mr. Cooley, a recent author, whose treaties on Constitutional Limitations, is rapidly becoming an authority in the. courts, in the course of his discussion and explanation of the rule “due process of law,” says: “We shall find that general rules may sometimes be., as obnoxious as special, when in their results they deprive parties of their vested rights. While every man has a right that his own controversies shall be judged by the same rules which settle those of his neighbors, the whole community is also entitled, at all times, to demand the protection of the ancient principles which shield private rights against arbitrary interference, even though such interference may be under a rule impartial in its application. It is not the partial character of the rule so much as its arbitrary and unusual nature, which condemns as unknown to the law of the land:” Cool. Const. Lim., 355.
The proper inquiry to follow, is, what effect is to be given to the registration of a citizen, or a qualified voter, and whether, and to what extent, the registra *246 tion invests tbe registered person with elective franchise; and next, whether the setting aside and annulling by the Governor, of the registration of a county, in the manner authorized by the Act of March 8th, 1867, is, in respect of the persons who have obtained registration and certificates, a proceeding which fulfills the rule of “due process of law/’
The functions and powers of the Commissioner of Registration, are of a judicial nature. More distinctly so are they, than are those of the ordinary inspectors or judges of elections. And of these latter, it was said in the opinion of the Supreme Court of the State, in Rail vs. Potts, 8 Hum., 225, “they are unquestionably judicial officers.” When a person applies to a Commissioner for registration and certificate, the Commissioner hears the proof of witnesses, both for and against the claim of the applicant; and if the proofs adduced establish or satisfy the judgment of the Commissioner that the applicant possesses the qualifications prescribed by the Franchise Act, and is not subject to the disqualifications denounced by it, the Commissioner adjudges the applicant to be entitled to the franchise, and causes registration to be made of his name, as a qualified voter, and issues to him a certificate, which declares his registration, and authorizes him to vote at public elections. This ends the functions and powers of the Commissioner, in regard to the applicant, and completes the evidence and award of his right and title to the privileges of the elective franchise. These functions and powers characterize essentially an officer of judicial nature.
*247 The act and decision, and judgment of the Commissioner, is of a judicial nature. Under the franchise law, he is the appointed tribunal and the only tribunal, empowered to ascertain and decide what persons possess the qualifications which entitle to the privileges of the elective franchise, and to award to them the evidence of their right to vote, and authority to exercise and enjoy the right. Without his adjudication, np person can establish his right, and obtain the evidence of his right, and authority to exercise and enjoy it. And with his adjudication, persons are invested with the privilege of the franchise, and the right to exercise and enjoy it. It is an adjudication upon a right, and a decision declaring its existence, and an awarding its enjoyment. Without and until such adjudication, the privilege of the franchise has no practical existence to the person, and with such adjudication, the applicant is invested with the privilege and the authority to exercise it.
The functions and powers, then, of the Commissioner, are of a judicial nature, • and his office is an office of a judicial nature, and his decisions are of a judicial nature; and his decision in favor of an applicant, is an adjudication of a right; and the certificate issued to the applicant, is in the nature of a judicial award, declaring, evidencing and establishing the right.
The registration law of Tennessee differs essentially from the Registry Acts of some of the States, to which reference has been made in the argument of *248 counsel. The purpose and operation of the Registry Acts referred to, are, to regulate the exercise of the right to vote. They are election regulations, established to facilitate the conduct of elections; to preserve order at the polls; to guard against the strifes and delays likely to occur at the ballot box, by the investigation and trial there, of controversies, as to the residence, and other circumstances, on which depend the right to vote at the particular box and on the particular occasion.
Essentially different are the purpose and function of the registration proceeding under the Franchise Act of Tennessee. The purpose and operation of the proceeding, are, to try and adjudicate the right to the franchise. It is a tribunal to try and determine the right, and to establish the right of those entitled, and deny the claims of those not entitled. The Registry Acts of the States mentioned, purport to regulate the exercise of the right; the registration proceeding of Tennessee, investigates, ascertains, tries, and establishes or denies, the existence of the right. The former regulate the exercise of the right in the particular manner, at the particular place, on the particular occasion. The latter regards and adjudges on the existence of the right, at any time or place, or on any occasion. Undoubtedly, there are the resemblances between the proceeding here, and the proceeding in the other States. Such resemblances do not go to the substantial and essential character and effect of the proceeding under the Tennessee statutes. The broad *249 line of difference is, that, the one is a regulation of the exercise of the franchise, while the other is an adjudication of the right to the ’ franchise.
The next matter of inquiry is, whether the setting aside, and annulling by the Governor, of the registration of a county, is, in respect of the persons whose registration and franchise are so set aside and annulled, “due process of law?”
An illustration at hand, will- help to an easy and correct answer. The Clerks of the County Courts, and Commissioners of Deeds, are, by law, authorized to take and certify probates and acknowledgments of deeds and other instruments, required to be registered in the registry books of the counties. Such probate or acknowledgment and registration of deeds, is prima fade evidence of their execution; and so certified and registered, the deeds evidence, or operate to invest the grantees with rights of property. If An Act of the Legislature were enacted, empowering the Governor to set aside and annul these certificates, and the effect and operation of them, and deprive or divest the grantees of rights created by, or derived from them, the absurdity and constitutional nullity of the statute would be intensely manifest. The absurdity and nullity would not be dispelled by showing that the statute authorized the Governor to set aside and annul the probates and registration of any and every instrument, made or done by any clerk or commissioner, if it be made to appear to his satisfaction, that frauds and irregularities had intervened, in the conduct of the clerk or commissioner, in respect of any of the instruments, or of *250 some party to some of the instruments. It .is not easy, if possible, to point out any material difference of principle, between the case mentioned for illustration, and the case in hand for decision. A large degree of hardihood or ignorance, is requisite to maintain that such power can be invested in the Governor by Legislative Act, or that the exercise of such power is due process of law, 'or can divest the grantee of any right acquired by the probate and registration.
The power bestowed upon the Governor, to annul the registration, is, in most essential particulars, devoid of the quality of “due process of law.” His action is ex parte, and without opportunity of defense. The citizen qualified by registration and certificate, is deprived of whatever right the registration and certificate confer, without a hearing, and without knowledge or information, that action is proposed to be had, which affects his rights.
Again: — The citizen may be deprived of whatever right his registration and certificate confer, without any wrong or fault on his part, and even without any wrong or fault alleged against him. The statute authorizes the Governor to set aside and avoid the registration of a county, where it is made to appear to him that fraud or irregularities have intervened in the registration of the county. The fraud or irregularity may be of the Commissioner, in which hone of the registered voters had any participation; or it may have been fraud or irregularities in some of those who have 'obtained registration and certificates, and not of others who in no manner participated in, or are charged with participa *251 tion in the frauds or irregularities. Thus, persons are deprived of their franchise, not. for their own wrong, but for the wrong of others.-
Again: — The fraud or irregularity alleged and acted on, may be important or unimportant; of a degree or kind which furnishes just cause for divesting a right, or it may be trivial. All is placed in the arbitrary discretion of the Governor, and. from his action the registered and qualified voter has no appeal or redress.
Again: — -The annulment of the registration may be remote from an election or on the very eve of the election, and too late for the qualified citizen to set about and get up his proofs, and obtain a new adjudication of his right; and it may be that his proofs are destroyed by the death of witnesses, the failure of memories, the loss of papers, the change of Commissioner, and change of judgment upon the proofs. Thus the right established by the registration, may- be, for an impending election, annulled,, or permanently and for all time.
Again: — The annulment of the right conferred by the registration and certificate, is not limited to one occasion; it may be done by the Governor, from time to time, and for all time, without end. Practically and effectually, the power given by the Act, enables the Governor to defeat and annul, not only the particular registration and certificate in regard to which the power is exercised; but behind and under that, the ultimate right of the qualified citizen to the franchise. The power to annul the registration and certificate as often as granted and without end, invests the Governor with *252 power, practically, virtually and effectually, tQ destroy the ultimate right to the franchise, which the statute confers upon the person having the prescribed qualifications. The Governor is, practically, made the ultimate arbiter and judge of the right of all and of every citizen to the franchise. Against his discretion and will, none can exercise the right, and none can establish and secure their right.
And further: — This power extends not only to one county, but to all the counties of the State; and not only to one qualified voter, but to every qualified voter in the State; and not only for one time or occasion, but for every and all times and occasions, and without restraint and without end.
It is impossible to consider the exercise of such power, “due process of law,” or the statute which bestows such power, ‘The law of the land.”
Upon another aspect, the Act, in the particular concerned, may well be declared void.
This Court does not entertain the notion that it is authorized to declare a statute void, because of repug-nancy to the spirit of the Constitution. Considerations of this kind, are properly addressed to the legislative body. Courts only act, when the conflict is shown with an express provision of the organic law, or with a necessary implication from an express provision. Instances of such implication are found in cases, as when the delegation of an express power to one department of the government, is held to be by necessary implication, the prohibition of the exercise of the power by another department; or when the delegation of a power to the *253 National government, is beld to be tbe negation of tbe power to tbe State governments.
It is scarcely necessary, however, to resort to implication, in tbe aspect of the case proposed to be shown, to find valid ground on which to rest the objection to the organic validity of the Act under consideration.
The form and plan of the Constitution of the State, expressed in the whole and in the parts, declare, organize and establish, a system and form of government, popular, elective, republican, wherein sovereignty is in the electoral body of the people. This is expressed in. and by the clauses which delegate, reserve, restrain and distribute the powers of government among the several departments and officers, for the purpose of maintaining and enforcing checks and balances upon the several functionaries, and so securing the liberties and rights of the people, and a popular, elective and republican form of government.
The statute which empowers the Governor, in his discretion, practically and effectually to abrogate the right to vote, of any and every qualified citizen of the State; and at any time and for all time,, and in any and all elections, is repugnant to that portion of the Constitution which is expressly ordained to secure to the people, the right to elect the officers of the government.
The statute which practically and effectually empowers the Governor to determine who, of the qualified citizens, shall vote and who shall not vote, and who shall elect and who shall not elect, the officers of the government, himself included, is repugnant to that por *254 tion of the organic frame of the government, which was ordained to establish and maintain a republican form of government.
The statute which empowers the Governor, practically and effectually to divest out of any and every qualified voter, his right to vote, not only once, but from time to time, and without end, is repugnant to those provisions of the organic law which are ordained to invest the Courts with judicial power, and to exclude the ex-' ecutive head of the government from the exercise of such power.
For these reasons, the Court is constrained to hold, that the statute which confers on the Governor the power to set aside and annul the registration of a county, in whole or in part, is unconstitutional and void. In this determination, are included the Act of March 8th, 1867, chapter 36, sections 4 and 5; and that part of the Act of February 26th, 1868, chapter 52, so far as it authorizes the Governor to set aside registration, and undertakes to confirm his acts of this kind, done before the passage of the Act; and to punish persons who vote, or who attempt to vote, "by virtue of certificates issued from a registration declared null and void” by the Governor.
The point thus decided, disposing of the case in consideration, the Court does not think it necessary or proper to consider the argument of counsel upon the question of the validity of the general Franchise Acts.
It is not to be understood, from any thing stated in this opinion, that the Court questions or doubts the sovereign power of the people of the State, expressed *255 through a Constitutional Convention or other organic mode, to prescribe the qualifications of voters and the limitation of the elective franchise, whereby the franchise may be bestowed upon persons not before entitled to it, or may be taken from persons before' entitled to it; subject, however, to such restraints upon this power as exist in the Constitution of the United States.
The judgment of the Court below is affirmed, and the defendant discharged.
George Andeews, Judge:
The elective franchise is at once, a right and a trust, conferred by the people of a State, acting in their supreme and sovereign capacity, upon such members of the body politic as they, in their sovereign discretion, deem should hold and exercise it, having regard to the protection, both of private lights and of public interests. Once conferred upon the citizen, it is a franchise in which he has a right of property which the law protects. But it is a franchise having its origin in the will of the body politic; and is a power held by the citizen, in trust, to be exercised for the public welfare, and which, in a moral point of view, the citizen has no right to use for his private benefit, in opposition to the public interest. Being a franchise, the law protects the right of the citizen in it, but, inasmuch as it is also a trust, the citizen has no right to misuse it, and commits a crime if he sell it.
The duty of the Legislature is, to protect both the public interest and the private .right in the franchise, *256 and for this purpose, it may provide reasonable regulations for the exercise of the right, in particular modes and times, and adopt precautions against frauds and violence. The complete protection of the franchise, requires, as well the exclusion of those not entitled to exercise it, as the admission and protection of those who are thus entitled. Where the franchise is not universal, the persons who are entitled to it, must be ascertained, either at the polls, or, at a time pri- or to the election; and upon principle, it is immaterial which of these modes is adopted, so long as the end of such ascertainment is attained, and a fair opportunity afforded to all those who are entitled to the franchise, to exercise it.
Registration laws, therefore, operating in accordance with the above principles, are valid, and have been so held. But the power of the Legislature is, to regulate the exercise of the right, and not to destroy the right itself.
The constitutional amendments, of 1865, conferred upon the General Assembly elected in that year, the power to determine “the qualification of voters, and the limitation of the elective franchise;” in other words, to determine what physical, intellectual, moral or political qualifications, the voter should possess, and what changes should be made in the boundaries which had theretofore limited and circumscribed the classes of citizens entitled to the elective franchise.
These qualifications, and this limitation, being thus determined, no power existed in the Legislature, arbitrarily to depx-ive any citizen of the right to vote, who *257 should be found to possess these qualifications, and to be within this limitation. In pursuance of the power thus conferred, the Legislature enacted the statute recited in the foregoing opinion, by which it determined the future qualifications of voters, and limited the elective franchise to certain classes of citizens therein specified; and, as the qualifications and limitations were dependent, in each individual instance, upon questions of fact involving the past status of the citizen, it also provided the official machinery for the judicial determination of those facts, and for preserving and certifying such determination.
The Commissioners of Registration, under these statutes, are not courts, but they, nevertheless, act judicially. There is a large field of judicial inquiry in which action is had, which is judicial in its nature, but which is, nevertheless, not that exercise of “judicial power,” the exercise of which, is restricted to the courts by our Constitution. Judges of elections, assessors of revenue, commissioners for assessment of damages on the taking of property under the right of eminent domain, clerks, in taking the probate of deeds, and various other officers, exercise, to a greater or less extent, judicial functions, and by their decisions, determine questions of fact and conclude rights, though they are not courts. But, when the question of the right of a citizen to a property or privilege,. is referred by the law to a tribunal thus created, its final decision is an adjudication upon the. right, and cannot, at the mere discretion of either the Executive or Legislature, be arbitrarily set aside or disregarded. When the right of a *258 citizen to vote has been, by the proceedings now under discussion, judicially ascertained, and duly certified, it may be questioned or set aside by due process of law: by some regular proceedings applied to the facts of his particular case, either in the courts, or, possibly, outside of the courts, but not by the exercise of mere arbitrary discretion, which disposes of his right without, under due process of law, deciding upon his right.
The provision of the statute now under discussion, allowing the Governor to set aside the registration of voters in any county, when it shall be made to appear to his satisfaction that frauds and irregularities have intervened in the registration in such county, is obnoxious to the objection above indicated.
It is not in the nature of an appeal to another judicial officer. The Governor does not at all inquire whether any or all the persons who have registered are entitled to the privileges of the franchise, or whether the determination and certificate of the commissioner is correct in any particular case. He does not determine judicially under an original or appellate authority, and upon due hearing, that there has been fraud or irregularity in any individual case, and therefore annul the registration and certificate in that case; but upon ex parte determination that frauds and irregularities have intervened at any point in the registration, he annuls the registration and certificates of all the voters in the county. Because A has committed a fraud by illegally procuring his own registration, B and C are at once deprived of the benefit of the adjudication made in their favor; because the commissioner has fraudulently grant *259 ed certificates to a portions of the citizen of the county, the certificates of all the other citizens are annulled without trial or decision on their validity.
What amount of fraud or irregularity, by whom caused or perpetrated, or to what extent, material or immaterial, shall authorize the Governor to set aside a registration, is left to his sole and arbitrary discretion; and this discretion may be exercised, as well upon the eve of an election, when a new registration is impossible, thereby effecting a total disfranchisement of the county, as at a time which would afford opportunity for a new and valid registration.
It does not meet the objection, to urge that the setting aside of the registration does not deprive any citizen of his vote who is entitled to it, since he may at once apply for a new registration and certificate; because he is deprived of the result of a judicial determination already made in his favor; and, as above stated, the action of the Governor may be made at such time as to deprive him of his ballot altogether; and this, not only when he is innocent of any fraud, and his registration valid and free from any irregularity, but without any allegation of fraud or irregularity affecting him.
I do not base my own conclusion, in this ease, upon the doctrine that the power given to the Governor is opposed to the principles of republican government; because, I think such a decision involves the assumption of a very delicate and even dangerous responsibility on the part of the Court; nor upon the position that the action of the Governor involves the ex *260 ercise of judicial [power; because, in my opinion, the jurisdiction attempted to be conferred upon him, is not that kind of judicial power, the exercise of which is, by the Constitution, limited to the courts, and denied to the Executive.
The objection to this particular power is, not so much that it is judicial, as that it is arbitrary. The argument used upon the one hand, that enormous frauds in the registration of voters could be prevented or defeated only by the Legislation now in question; and the opposing argument, that the power granted to the Executive, is dangerous to the public liberties, I consider entitled to weight with the Legislature, whose duty it is to provide for the public welfare and safety, by the enactment of laws; rather than 'with the courts,'whose functions it is, only to construe and enforce the laws, and which have, in that respect, no judicial or legislative discretion.
Opinion by
Jas. O. Shackelford, Judge:
The defendant in error, was presented by the grand jury of the County of Gibson, at the March Term, 1868, for illegal voting. The presentment is in the words and figures following: •
“The grand jury of the State of Tennessee, elected, impaneled, sworn and charged to inquire, in and for the body ' of the County of Gibson, upon their oaths aforesaid, present, that, Robert C. Boyle, on the 10th of December,11867, was Commissioner of Registration, in and for the County of Gibson, aforesaid; and being Commissioner of Registration, as aforesaid, on the day *261 and year aforesaid, issued a certificate of registration to one William Staten, a citizen of tbe County of Gibson, aforesaid; that, afterward, on tbe 25th oí December, 1868, William G. Brownlow, tbe then Governor of tbe State of Tennessee, issued two proclamations, wherein and whereby, be abrogated, annulled and set aside the said registration of tbe said Boyle, aforesaid Commissioner of Registration,' in and for Gibson County. That, after tbe issuing of tbe proclamation, aforesaid, by tbe Governor of tbe State of Tennessee, tbe said William Staten, in tbe County of Gibson, on tbe 7th day of March, 1868, at an election for Sheriff and Tax Collector of tbe County of Gibson, then and there duly bolden, without any certificate of registration as a voter, other than tbe one aforesaid, issued by tbe said Boyle, well knowing himself not to be a qualified voter, did unlawfully and willfully, give in bis vote for Sheriff and Tax Collector, contrary,” etc. To which said presentment, tbe defendant, Staten, appeared, and filed a demurrer : “For cause says, it appears from said presentment, be was a legal and qualified voter of Gibson County, because be bad a certificate of bis qualification, issued by R. C. Boyle, tbe rightfully appointed Commissioner of Registration, as appears from said presentment; and this defendant further states, that Wm. G. Brownlow bad no rightful authority to set aside tbe acts of tbe said Boyle, Commissioner of Registration; and that tbe act of tbe said W. G. Brownlow, setting aside said registration of voters, was unconstitutional and unauthorized; and this be is ready to *262 verify, and prays judgment be granted.” Upon argument, the demurrer was allowed, tbe presentment cpiashed; from which the State appealed to this Court.
The questions presented for our consideration, arise upon the validity of the Acts known as the Franchise Laws.
2. Admitting the constitutionality of the several Acts in question, can the Legislature divest and set aside the right of franchise when once vested, or can the Legislature delegate the power to the Governor of the State, to set aside by proclamation, the registration of a county in part or in whole?
The questions presented, are of a grave and serious character, involving as they do, the rights of so many of our citizens who are deprived of the right of suffrage by existing laws. My associate, Judge Smith, has delivered the opinion of the Court. I fully concur with him in the views expressed. I present my views of the validity of said Acts, and of the powers of the Governor to set aside the registration of a county. It is insisted the 9th section of the schedule of the amended Constitution, which gave to the Legislature that should first assemble the right, to determine the qualification of voters, and the limitation of the elective franchise, vested no power in the General Assembly to alter or change article 4, section 1, of the Constitution of the State; and that the right of voting is an inherent and inalienable right, of which the citizen cannot be deprived ; and any act of the people in convention, depriving the citizen oí the right, is a violation of the Constitution of the United States, the supreme law of *263 the land. That the object and purpose of the Constitution in the 9th section of the schedule referred to, was intended to vest the power in the Legislature to enfranchise the freedmen, who became citizens upon the adoption of section 1, article 1, of the amended Constitution.
For the proper determination of the principles involved, it becomes necessary to examine the past history of our country, and see the grounds upon which the right of suffrage is based.
First, It is insisted that the right of suffrage is a vested right, and an inalienable one; that, under the Constitution of the United States, the people of a State in convention or Legislature, cannot deprive a citizen of that right. In article 1, section 1, of the Bill of Eights, prefixed to the Constitution of the State, it is declared all power is inherent in the people,. and all governments are founded on their authority, and are instituted for their peace, safety and happiness; and for the advancement of these ends, they have, at all times, an indefeasible right to alter, abolish or reform their government as they may see fit. The subsequent sections of the Bill of Eights consist of those absolute rights of personal security — the right of personal liberty, and the right to acquire and enjoy property. These rights have been justly construed, and are declared by the Bill of Eights, to be natural, inherent and inalienable. The effectual security and enjoyment of them, depends upon the existence of civil liberty. They are solemn declarations of principles, to which every free person is entitled. These rights have been wrested, from time to time, from the English monarchs, and were brought *264 to this country by our ancestors; anjl have been en-grafted upon the Constitutions of the different States, differing in language but not in principle. So ' careful were the framers of the Constitution to preserve these rights inviolate, they declared, in section .12, of the 11th article of the Constitution, the declaration of rights hereto prefixed, is declared to be a part of the Constitution, and shall never be violated, upon any pretext whatever.
Does the right of suffrage constitute a part of the Bill of Rights? It is insisted it does, and therefore the Convention had no right to delegate this authority to the General Assembly, whereby a part of the citizens have been disfranchised; that the right .of suffrage is a natural and inherent right in every free man. For the proper solution of this question, it becomes necessary to examine into the history of the formation of our State Government, and see if it was regarded as a natural and inherent right, or a political one. On the — day of-, 1789, the Legislature of North Carolina ceded to the United States the western territory, now embraced within the limits of this State. It was provided in the cession Act, the territory so ceded should be laid out, and formed into a State or States, containing a suitable extent of territory, the inhabitants of which, shall enjoy all the privileges, benefits and advantages set forth in the ordinances of the late Congress, for the government of the western territory. This cession was accepted, under the express condition that Congress should assume the government of the territory, and which they shall *265 execute in a manner similar to that which they established in the territory west of the Ohio; shall protect the inhabitants against enemies, and shall never bar or deprive them of privileges which the people west of the Ohio, enjoy. The people of the . territory now comprising the State of Tennessee, lived without representation, or exercising the right of suffrage, until 1796, when they framed the Constitution, under which they were admitted into the Federal Union. When they framed the Constitution, the inhabitants of the territory had no rights of franchise from any authority except that which is found in the cession Act of 1789, and the Act of Congress accepting the ceded territory, which is as follows:
So soon as there shall be five thousand free male inhabitants of full age, in the district, upon giving proof thereof to the Governor, they shall receive authority, with time and place, to elect representatives from their counties or townships, provided for every five hundred free male inhabitants there shall be one representative, and so on, progressively, with the number of free male inhabitants, shall the right of representation increase, until the number of representatives shall amount to twenty-five; after which, the number and proportion shall be regulated by the Legislature; provided no person shall be eligible or qualified to act as Representative, unless he shall have been a citizen of the United States three years, and in either case, shall hold in his own right, in fee simple, 200 acres of land; provided also, that a freeholder of 50 acres of land in the district, having been a citizen of the States, and *266 a resident of the district, or tbe like freehold and two years in the district, shall qualify a man as an elector or Representative.” See United States Statutes at Large.
Under this provision of the ordinance of 1789, the franchise, which was dependent upon the conditions and contingencies therein specified, was exercised, and the representatives of the people thus elected, framed the Constitution of the State, of 1796. The Convention that met and formed the Constitution, fixed the right of franchise. No one then doubted their power.
By the Constitution of 1796, every freeman of the age of twenty one years and upwards, possessed of a freehold in the county where he may vote, and being an inhabitant of this State — any and every freeman, being an inhabitant of any one county in the State six months immediately preceding the day of election, shall be entitled to vote for members of the General Assembly, for the county in which he may reside: Haywood and Cobb’s Revisal, 404.
This provision of the Constitution remained in force 'until 1834. Under its provisions any free man owning a freehold in the county was entitled to vote. Every male inhabitant residing in the county six months, was entitled to the right of suffrage — free persons of color being included in the term freemen. When the Convention met in 1834, to form the Constitution under which we now live, a feeling antagonistic to free negroes had been engendered in the public mind, growing out of sectional feeling. ' The Constitution adopted, deprived free persons of color of the right of suffrage.
*267 Those male inhabitants who were not citizens, and who had previously voted, were also deprived of the right. By the provisions of the Constitution of 1834, the voter had to be a citizen of the United States, and a citizen of the State for six months next preceding the election. See Article 4, sec. — of the Constitution. Here was an act of sovereignty by the people of the State, by which a class of citizens were deprived of the right of suffrage. This question came incidentally before the Supreme Court of North Carolina, in the case of the State vs. Manual, 4th Dev. Judge Gaston, in discussing the rights of suffrage, says: “The principle of freehold suffrage, seems to have been brought over from England with the first colonists, and to have been preserved in the colony afterwards. In the Act of 1843, 4 Sims’ Revisal, 171, it will be seen that a freehold of fifty acres was necessary to entitle an inhabitant of a county to vote. And by the Act of 1746, the freeholders of the towns of Eden-ton, Bath, Newbern and Wilmington, were declared entitled to vote for members of the Colonial Legislature. The Convention which framed our Constitution, was chosen by freeholders. The Constitution extended the elective franchise to every freeman that arrived at the age of twenty-one years, and paid a tax; and it is a matter of universal notoriety, that, under it, tree persons, without regard to color, claimed and exercised the right to the franchise, until it was taken from the freemen of color by the late amended Constitution. But surely the possession of political rights is not essential to constitute a citizen: if it be. then women, minors, and *268 persons who have not paid taxes, are not citizens. And free white men, who have not paid public taxes and arrived' at full age, but have not a freehold of fifty acres, inasmuch as they may vote for one branch of our Legislature, would be a sort of intermediate state, a sort of hybrid between a citizen and not. The term “citizen,” as understood in our law, is precisely analogous to the term “subject” in the common law.” It will be seen from this extract' from the opinion, the learned jurist did not regard the right of suffrage as a natural or inherent _ right; that freehold suffrage was a right grafted in the laws of the State from the English law; •and in the formation of the Constitution of that State, they claimed and exercised the right of depriving the free man of color from voting, though he had been recognized as a citizen by the highest tribunal of the State.
The right to control and limit the elective franchise by the sovereign will of the people, in the formation of their Constitution, so far as we are informed, has never been doubted. The right was exercised in 1834. Persons who were inhabitants of the State, could not exercise the right, unless they became citizens of the State and United States. This is one of the inherent rights of sovereignty, and has' been recognized by the people of the different States of the Union in the formation of their Constitutions, since the organization of the Government — each State limiting or enlarging the right of suffrage, thereby recognizing the principle as a political and not a natural right. It follows, therefore, that, from long established precedents, the people of the State, acting in their sovereign character, through *269 their representatives in Convention assembled, have exercised the right of determining the qualification of voters, and limiting the elective franchise. The right of suffrage is a political right or privilege, and not a natural or inherent right, and as such is subject to the will of the people in changing or altering the fundamental law.
No one has ever doubted that the right of sovereignty of a State exists with the people of the State; and possessing the sovereign power, they have the right to adopt and form such Constitution as may, in their wisdom, conduce to the public good and the protection of the whole people; provided, always, its provisions do not conflict with the provisions of the Constitution of the United States — the supreme law of the land. To arrive at the intention of the Convention, and a proper construction of the 9th section of the schedule affixed to the amended Constitution of the State, adopted and ratified on the 22d of February, 1865, it becomes, necessary to look to the condition of the State at the time the Convention submitted the amendments and schedule to the people, and the causes that induced their action in calling a Convention. In 1861, upon the attempt of the people of the State to throw off their allegiance to the Federal government, war ensued'.
Upon the approach of the Federal armies, the officers of the State government fled, taking the 'archives of the State with them. The courts of -the country were closed; judges, sheriffs, constables, the conservators of the peace, fled or refused to discharge the duties incumbent upon them. A dismal anarchy overspread the land; bands of roving banditti plundered with im *270 punity, the defenseless citizens. Life and property had no protection or security from the hands of violence. The machinery of the State government was broken up; the arm of the law was paralyzed. Military law controlled and governed the State. In this condition of the country the loyal citizens of the State determined to reorganize the government, open the courts, and give the citizen the protection of the law. A convention was called by some of the leading men of the State, with the approbation of the Military Governor, Andrew Johnson, who held his commission from the President of the United States. Delegates from a large majority of the counties met at Nashville, on the 9th of January, 1865, loyal citizens of the Government of the United States, and citizens of the State. That Convention adopted certain amendments to the Constitution; also, a schedule containing several sections, necessary and proper for the reorganization of the State government. Section 9, of the schedule, is as follows: “The qualification of voters- and the limitation of the elective franchise, may be determined by the General Assembly which shall first assemble under the amended Constitution.”.
The amendment and schedule were adopted by a large majority of the votes cast. Andrew Johnson, then Military Governor, in his proclamation of the 25th of February, 1865, says: “By virtue of the power and authority. vested in me, I do hereby declare the foregoing alterations and amendments and schedule thereto annexed, have been ratified by a vote of the people of- the State; and that such articles now consti *271 tute a part of the permanent Constitution, and tbe supreme law of the State of Tennessee.” It will be seen this action of the people was with the consent and approbation of the United States.
It is argued that this move of the people was without the sanction of the Constitution, and not in the mode prescribed for changing or altering that instrument; that a majority of the people did not vote in that election, consequently it is not binding upon them so far as it tends to change or alter the 4th Article, sec. 1, of the Constitution of 1834. It is admitted tin's move of the people was irregular, and not in mode prescribed by the Constitution, for changing or altering the same. A change in the fundamental law, when not made in the form which the law has prescribed, must always be a work of the utmost delicacy. But we were in the midst of a revolution — the organization of the State government was broken up — the laws were suspended; a starting point was necessary. All was anarchy and chaos. Every true man felt the necessity of restoring the supremacy of the law, and this could only be done by putting the machinery of the State government in operation, filling the various offices that had become vacant, and opening the courts of the country. This was not without precedent. The citizens of the United States upon the acquisition of California, flocked to that territory in large numbers. They were without law or order; but true to the instincts of the race, they met and organized a State government, elected their officers, and submitted their acts to the Congress of the United States, and were admitted among the *272 family of the States. Michigan also adopted a Constitution without the warrant or authority of the Federal government, and she was likewise admitted. The English government rests upon the same irregular organization. When James II, fled from the throne, he threw the great seal in the Thames; a convention of the people, without warrant of law, met and declared the throne vacant. One party held that it was an unlawful assembly; that its resolutions were nullities, and the sovereigns it set up usurpers. They maintained that, to the existence of a parliament, royal writs were indispensably necessary; that convention having met without any lawful authority, the defect could not then be supplied, and the houses were, therefore, mere clubs of private men, and ought, instantly, disperse. Much feeling and discussion arose, and authorities were cited against the validity of such an organization. Mr. McCauley in his third volume, page 24, of his History of England, says: “It is remarkable the man who took the most statesmanlike view of the subject, was Sargent Maynard. In the civil conflict of fifty eventful years, he had learned that questions affecting the highest interest of the State, were not to be decided by verbal cavils, by scraps of latin, and law phrases; and being the most subtle, and most learned of the English jurists, he threw aside as frivolous and out of place, that black letter learning, which some men far less learned, had introduced into the discussion.” We are, said he, “at this moment, out of the beaten path; if therefore, we are determined to move only in that path, we cannot move at all. A man in a revolution, determined to do nothing which is not strictly according *273 to established forms, resembles a man who has lost himself in a wilderness, and who stands crying, where is the King’s highway? In a wilderness a man should take the track which would carry him home. In a revolution we must have recourse to the highest law, the safety of the State.” A law was immediately enacted declaring the Convention a Parliment.
At the time of the meeting of the Convention in 1865, and the adoption of the amended Constitution, and schedule thereto, a large number of the citizens of the State, had attempted to throw off their allegiance to the Government of the United States, and to have given their allegiance to another government, which they had organized; and were then at war with the Government of the United States, to establish that government. They had, so far as they had the powei*, thrown off their rights of citizenship, and disclaimed any allegance to the Government of the United States, and were in actual hostility to it. The men composing the Convention were loyal to the government of their fathers. The great object and purpose was, to restore the State to its ancient moorings, from which it had been so ruthlessly driven by the action of a portion of her people. To do so, and prevent the State from being thrown again into hostility to the government, the 9th section of the schedule was adopted, delegating the power to the first Legislature, to determine the qualification of voters, and limitation of the elective franchise; they gave to that body power to change article 4th, sec. 1st, of the Constitution of 1834. It is insisted the Convention intended by this section of the *274 schedule, to give the Legislature the right to enfranchise the freed men. who would be emancipated under the provisions of the amended Constitution; that they did not intend to alter or change article 4th, sec. 1st, of the Constitution, which fixed the qualifications of voters. Such, we think, was not the only intention or meaning of the 9th section of the schedule. Looking to the condition of the State at the time it was proposed and adopted, the object and purpose of the Convention was to give to the General Assembly, the right to alter article 4th, sec. 1st, of the Constitution, to determine the qualification of voters, and to limit the elective franchise.
Under the powers vested in them, the General Assembly of the State, on the 15th of June, 1865, passed An Act determining the qualification of voters, and limiting the elective franchise. By the provisions of that Act: Sec. 1. Every free white man, 21 years of age, a citizen of the United States, and a citizen of the county where he may offer his vote, six months next preceding the day of election, and publicly known to have entertained unconditional Union sentiments, from the outbreak of the rebellion until the present time; Sec. 2. Every white man, a citizen of the United States, and a citizen of the county wherein he may offer his vote, six months next preceding the clay of election, having arrived at the age of 21 years, since the 4th of March, 1865, provided, he has not been engaged in armed rebellion against the authority of the United States, voluntarily; Sec. 3. Every white man, of lawful age, coming from another State, being a citizen of the *275 United States, and a citizen of the county wherein he may offer his vote, six months next' preceding the day of election; Sec. 4. Every white man, a citizen of the United States, and a citizen of the State, who has served as a soldier in the armies of the United States, and has been, or may be honorably discharged therefrom; Sec. 5. Every white man of lawful age, a citizen of the United States, and a citizen of the county wherein he may offer his vote, six months next preceding the day of election, who was conscripted by force into the so-called Confederate army, and was known to be a Union man, on proof of loyalty to the United States, established by the testimony of two-voters, under the provision of this Act; Sec. 6. Every white man, who voted in the Presidential election in November, 1864, or voted on the 22d of February,, 1865, or voted on the 4th of March, 1865, in this State — and all others who had taken the oath of allegiance to the United States, and may be known to the judges of the elections to have been true friends to the government of the United States, and would have voted in said previous mentioned elections, shall be entitled to the privileges of the elective franchise.
Then follows in the provisions of said Act, the causes which shall disqualify the citizen from the right of voting: Those who had filled civil or diplomatic offices in the so-called Confederate States, or who had left judicial stations in the United States, or State of Tennessee, to aid in any way, the recent rebellion against the authority of the United States, or who shall have been military or naval officers in said Confederate States, *276 above the rank of Captain in the army, or Lieutenant in the navy, etc., shall be denied and refused the elective franchise in this State, for the term of fifteen years, from and after the passage of the Act. By sec. 5, of this Act, in the disqualification in disqualifying citizens from the right of franchise, all persons, except those mentioned in other sections of the Act, were denied the privilege of the elective franchise in the State, for the term of five years, from and after the passage of the Act; and alb those persons embraced in the Act denying the right of franchise for five years, may be re-admitted to the privilege at the expiration of that time, by petitioning the Circuit or Chancery Court, upon proof of loyalty to the United States, and upon the testimony of two witnesses loyal • to the United States. By sec. 6, of the Act, the Clerk of the County Court, in each county, was appointed a Register, to open and keep a registration of voters; and before whom, upon proof and under oath, that the voter falls within the provisions of Article 1st of the Act, shall be made, and it was the duty of the clerk to issue to all such persons, a certificate of registration; and no one shall be permitted by the judges to vote, unless so registered. The oath prescribed by the Act was one of present and prospective loyalty, having penalties prescribed against persons taking it falsely. By the 9th section of the Act, it was provided, the power is reserved to alter, amend, or change the provisions of this Act, at any time when, in the opinion of the General Assembly of the State, it is right and proper to do so. Sec. 10 provides, that the Act shall take effect from and after its passage. '
*277 On the 5th of May, 1866, the General Assembly of the State, passed An Act, in effect, repealing the provisions of the Act of June 6, 1865, fixing other qualifications and limitations to the franchise law — providing the class of. voters in the 2d and 3d exceptions shall be forever disqualified from the right of suffrage; imposing an oath retroactive in its character, requiring past as well as future loyalty, except those who had voted in the previous elections, as provided in sec. 5, of article 1, of the Act of 1865, or those who had been appointed to civil or military office by Governor Andrew Johnson, or Governor Brown-low. By sec. 8, of the Act of May 5, 1866, it was provided, that all certificates issued under the provisions of the Act, be annulled, and shall not be used at any future election in this State, from and after the passage of this Act, except at the election of county officers, to be held on the first of March, 1866. By the provisions of this Act a Commissioner was appointed in each and every county in the State, with power to administer the necessary oaths, to register the names of each and every qualified voter, and to issue a certificate that such voter is entitled to the elective franchise. Such are the substantial provisions of the Acts of June 6, 1865, and May 3, 1866. /
It is insisted that the Act of the Legislature referred to is an ex post faoto law and a bill of pains and penalties, and is in conflict with the Constitution of the United States, and therefore, void and of no effect.
The right of suffrage being a political, and not a natural or inherent right, the sovereign power has the right to restrict or enlarge the privilege. The Act of *278 June 6, 1865, is not in conflict with the Constitution of the United States. It is not a bill of pains and penalties, nor is it an ex post faeto law, nor does it impair the obligation of any contract, and is, therefore, not in conflict with the Constitution of the United States. In the case of Calder vs. Butts, 3 Dallis’ U. S. Rep., 386, the Court defined ex post facto laws to be, laws making an act done before the passage of a law, which was innocent when done, criminal, and inflicting a punishment for said act. The general interpretation has been, and is, that the phrase applies to acts of a. criminal nature: Story on the Constitution, vol. 2, sec. 1, 345. If the right of suffrage was a natural or inherent right, it would, in effect, be a bill of pains and penalties. Story defines bills of attainder, as they are technically called, such special Acts of the Legislature as inflict capital punishment upon persons supposed to be guilty of high offenses, without any conviction in the ordinary course of judicial procedure. If it inflicts a milder punishment than death, it is called a bill of pains and penalties: Story on the Constitution, vol. 2, sec. 1, 444. The right here exercised, was one of sovereignty, depriving the citizen in the Act of June 1st, 1865, for a period of time, from exercising the right of franchise, which was a trust or privilege extended to him by the right of the sovereign power, and which it had the right to recall at any time, without the violation of any vested right. It is insisted, the Supreme Court of the United States, in the late case of Garland, has determined the questions involved in this case. Upon an examination of that case, it will *279 be seen, the principles involved are not analogous to the principles now before this Court. The question involved in that case was, (and settled by that court,) when a citizen has an office, employment, or calling, the State can not, directly or indirectly, enforce the • forfeiture by prescribing an oath, before the citizen can discharge the duties. The decision has reference alone to civil rights, and those guaranteed under the Bill of Rights.
The State, in a sovereign capacity, cannot deprive the citizen of right to labor, and from the enjoyment of the proceeds of his labor, by the imposition of an oath. This, the Supreme Court says, cannot be done, as it amounts to a forfeiture of an estate which the party has in his calling or possession. There is a clear .distinction between the case settled by the Supreme Court of the United States, and the case under consideration. The one is an inherent and natural right, and the other, a political right or privilege, a trust delegated. The first falls directly within the prohibitions of the Constitution of the United States; the other is a trust, subject to be revoked by the sovereign will.
This brings us to the consideration of the question .before the Court. The defendant, Staten, under the provisions of the Franchise Law, passed May, 1866, was a registered voter. He had, according to the requirements of the statute, complied with the law, and the granting him a certificate by the Commissioner of Registration, has vested him- with the right of franchise. Can he be divested of this right by An Act of the Legislature, or by the proclamation of the Governor, acting under the author *280 ity of An Act of the Legislature? It is insisted that power is conferred upon the Governor of the State, by sections 3 and 4, of the Act of the Legislature, passed May 8, 1867.
By the 3d section of the Act, the registration of the County of Overton, heretofore had under the Franchise Act of May 3, 1866, be, and the same is hereby, declared null and void, and no person shall be entitled to vote by virtue, of any certificate issued under said registration; and the provisions of this Act, shall extend to any county in this State, when it shall be made to appear to the satisfaction of the Governor, that frauds and irregularities have intervened in the registration of voters in such counties; and the Governor shall make known such facts, and set aside such registration. Section 5 provides, any person violating the above sections, by voting by. a certificate thus declared void, shall be guilty of a misdemeanor, and shall be fined not less than ten dollars nor more than one hundred dollars. We have shown, the right of franchise having been once vested, the Legislature has no power to divest it. Section 8, of article 1, of the Bill of Rights declares, that, no freeman shall be taken or imprisoned, or disseized of his freehold, liberties or property, or outlawed or exiled, or in any manner destroyed, or deprived of his life and property, but by the judgment of his peers, or the law of the land. The right of suffrage is a privilege; it is a right; one that is regarded by our race of people as more valuable than any other right with which he is invested; it is regarded as more valuable than property, for by it he *281 guards and protects Ms life, liberty and property; when clothed with the right, he has a vested interest, of which he cannot be deprived by any act of the Legislature. It can only be taken by due process of law, or by the will of the people, acting in their sovereign character. It is a right secured to the citizen, under the Constitution of the State. By the provisions of the Franchise Acts, and Constitution of Tennessee — he having complied with the laws regulating the elective franchise — his rights became vested, and could not be taken away by any act of the Legislature. They have no power to divest such rights; it follows they could not confer it upon the Governor. And the several sections of the Act attempting to confer this power upon the Governor, is without warrant by the Constitution, and therefore, void. It is an attempt on the part of the Legislature to confer upon the the Governor judicial power, which is in conflict with the Constitution. If the Governor has the power to set aside the registration of a voter, he has the power to set aside the judgment and decrees of this court. For illustration: If a citizen, under the Franchise Law, entitled to a vote, should bring himself within the provisions of the law, and the Register should refuse to give him a certificate upon a mandamus to compel him, and the Circuit Judge should be of opinion he was entitled to his certificate, upon an appeal to this court, the judgment should be affirmed and the certificate awarded, could the Governor set aside and declare the judgment of this court void? Such would be the legal effect if we should give force to the Act. Surely *282 it cannot be supposed) for a moment, under our Constitution an laws of the land, such power could be rightfully vested in the Executive. To so hold, would place the rights and liberties of the people in the hands of the Executive of the State. The statement of the proposition is an answer to it: if he has the right he can disenfranchise every citizen of the State. This opinion is not in conflict with the principles settled in the case of Sherbrook vs. Ridley. In that case, Ridley sought to have a certificate granted him, upon the ground of his having been pardoned by the President of the United States, he having been, previous to the war, a voter. The Court held he did not bring himself within the provisions of the law, and was not, therefore, entitled to a certificate. In the case of-Sher-brook vs. Ridley, the writer of this opinion delivered the conclusions of the court. No reason was given for the opinion. I now give the reasons prepared in that case, in the case under consideration, so far as the right of the people, in their sovereign capacity, to determine the elective franchise, or to delegate their power to the Legislature, is embodied. It follows, from these views, I am of the opinion, the convention that met 9th January, 1865, and the acts of which was ratified by the people, had the power to limit and determine the elective franchise, and to delegate the same to the Legislature; and that the power exercised by them was not in conflict with the Constitution of the United States; and that the Franchise Act of 1865, and subsequent Acts determining and limiting the elective franchise, are within the provisions of the Constitution; that where the right of *283 franchise had vested under the provisions of the law, as in the case before the Court, the Legislature had no power to divest it, nor could they confer it upon the Governor, and the Act giving him power to set aside the registration, is void.
It follows, therefore, that there is no error in the judgment of the Court in sustaining the demurrer to the presentment, and the judgment must be affirmed.